Louis TERRAZAS, W.E. Tucker, Linda Allison Frederick, Verne D.J. Phillips and Ed Emmett, Plaintiffs,

Jesus Rodriguez, et al., Plaintiffs-Intervenors,

R.A. Deison, Jr., et al., Plaintiffs-Intervenors,

v.

William P. CLEMENTS, Individually and in his official capacity as Governor of the State of Texas; et al., Defendants.

Civ. No. 3–81–2205–R.

United States District Court,
N.D. Texas,
Dallas Division.

Jan. 4, 1984.

Thomas G. Crouch, Crouch & Jones, Patricia A. Hill, Dallas, Tex., for senate plaintiffs (CA 3–81–1946–R).

John N. McCamish, Jr., Pat Deely, McCamish, Ingram, Martin & Brown, Inc., San Antonio, Tex., for house plaintiffs (CA 3–81–2205–R).

Randall B. Strong, Daniel R. Jackson, Baytown, Tex., for Baytown plaintiffs (CA 3–81–2263–R).

Joaquin G. Avila, Jose Garza, Norma V. Solis, Judith A. Sanders, Mexican American Legal Defense and Educational Fund, San Antonio, Tex., Albert H. Kauffman, Dallas, Tex., Vilma S. Martinez, Morris J. Baller, Mexican American Legal Defense and Educational Fund, San Francisco, Cal., for MALDEF intervenors.

J. Richie Field, Crews, Field, Steele & Page, Conroe, Tex., for Montgomery County intervenors.

David R. Richards, Executive Asst. Atty. Gen., State of Tex., Steve Bickerstaff, C. Robert Heath, Martha E. Smiley, Bickerstaff, Heath & Smiley, Richard E. Gray, III, Gray, Allison & Becker, Austin, Tex., for defendants Mark White, William P. Clements, William P. Hobby, Bill Clayton, Bob Bullock and Bob Armstrong.

John Harmon, R. James George, Graves, Dougherty, Hearon & Moody, Austin, Tex., for defendant Chester R. Upham.

Bob Slagle, III, pro se.

Cullen Smith, Larry O. Brady, Naman, Howell, Smith & Lee, David Guinn, Michael Morrison, Baylor Law School, Waco, Tex., for defendant David Dean.

William French Smith, U.S. Atty. Gen., Paul Hancock, Robert S. Berman, David S. Cunningham, III, U.S. Dept. of Justice, Washington, D.C., amicus curiae Dept. of Justice.

Before RANDALL, Circuit Judge, and SANDERS and BUCHMEYER, District Judges.

RANDALL, Circuit Judge:

In this opinion, we decide whether the State of Texas has violated section 2 of the Voting Rights Act, 42 U.S.C.A. § 1973 (West Supp.1983), or the fourteenth amendment to the United States Constitution in drawing the districts to elect members of the Texas House of Representatives from Dallas County. Specifically, we consider the contention of a group of hispanic voters (the "MALDEF Intervenors")[1] that splitting the Dallas hispanic population into three separate districts cancelled out its voting strength. Only the seventeen House districts in Dallas County created by the State's 1983 reapportionment plan (the "1983 House plan"), see Act of May 20, 1983, ch. 185, 1983 Tex.Sess.Law Serv. 756 (Vernon), are directly at issue.

I. PROCEDURAL BACKGROUND.

Originally, this action encompassed challenges by a variety of parties to the reapportionment plan (the "LRB House plan") for the Texas House of Representatives adopted in 1981 by the Legislative Redistricting Board (the "LRB"). On November 6, 1981, the House Plaintiffs filed suit in the United States District Court for the Western District of Texas. The complaint

---

1. Terms defined in our opinion of March 24, 1982, *Terrazas v. Clements*, 537 F.Supp. 514 (N.D.Tex.), *stay denied*, 456 U.S. 902, 102 S.Ct. 1745, 72 L.Ed.2d 158 (1982), will be used herein as therein defined.

named as defendants various Texas public officials—the Governor, the Lieutenant Governor, the Secretary of State, the Attorney General, the Speaker of the House of Representatives, the Comptroller of Public Accounts and the Commissioner of the General Land Office (collectively, the "State Defendants")—along with the chairmen of the State Democratic and Republican Parties. Allegedly, certain district lines in the LRB House plan deliberately discriminated against black, hispanic and republican voters.

The action was transferred to this Court, and consolidated with two other actions: a parallel suit contesting the Senate reapportionment plan (the "LRB Senate plan") and a separate attack on the LRB House plan filed by the Mayor and the City of Baytown, Texas ("Baytown"). This Court also allowed two other groups of Texas voters to intervene. On January 4, 1982, R.A. Deison, Jr. and other individuals, all claiming to reside in Montgomery County, Texas ("Montgomery County"), entered the Senate and House cases to raise constitutional challenges. On January 6, 1982, the MALDEF Intervenors joined the Senate and House actions to assert causes of action under the constitution and section 2 of the Voting Rights Act. The early history of these proceedings and a summary of the claims of each party appear in our earlier opinion, *Terrazas v. Clements,* 537 F.Supp. 514 (N.D.Tex.), *stay denied,* 456 U.S. 902, 102 S.Ct. 1745, 72 L.Ed.2d 158 (1982), and will not be repeated here.

During the course of these proceedings, the Department of Justice, on January 24, 1982, objected to the LRB Senate and House plans under section 5 of the Voting Rights Act, 42 U.S.C.A. § 1973c (West Supp.1983). The plans were thus rendered unenforceable. Until the Department of Justice precleared the reapportionment plans, the parties' constitutional and statutory challenges remained nonjusticiable; thus, the progress of this litigation was suspended. When the Department of Justice objected to the LRB Senate and House plans, this Court had already conducted a hearing, on January 18–23, 1982, which ad-

dressed the merits of those plans. We conducted a second hearing on March 1–2, 1982, to reconsider those plans, along with other plans submitted by various parties, in order to select acceptable temporary plans under which to conduct the 1982 Texas elections. On March 11, 1982, this Court installed the LRB Senate plan and a modified version of the LRB House plan as temporary court-ordered plans. The 1982 Texas elections were held under the temporary plans.

In our opinion explaining the adoption of the temporary plans, this Court urged the Texas Legislature to adopt procedures to resolve the Department of Justice's objections to the LRB plans. *Terrazas v. Clements,* 537 F.Supp. at 548. Ultimately, on May 16, 1983, the Texas Senate approved a new Senate plan (the "1983 Senate plan"), and, on May 20, 1983, the Governor signed a bill adopting the 1983 House plan. The State submitted the 1983 plans to the Department of Justice; on August 1, 1983, the Department precleared the 1983 House plan and on September 6, 1983, the Department precleared the 1983 Senate plan, thus freeing this Court to consider whatever issues remained outstanding.

On September 21, 1983, this Court directed the parties to file statements identifying the issues still in controversy. The order set out a schedule for submitting briefs and proposed findings. Although we believed that the action could be determined on the basis of the previous record, we also extended an opportunity for an additional hearing, but required proffers of anticipated evidence from any party who believed that the record required further development. The schedule was to culminate in oral argument on November 21, 1983.

The response to this order demonstrated that only the MALDEF Intervenors sought an adjudication of constitutional or statutory claims relating to the 1983 House plan. Although the Senate Plaintiffs requested rulings and a hearing on the 1983 Senate plan, the House Plaintiffs filed nothing. Baytown, which had participated in the

January, 1982 hearing, likewise failed to file a statement of issues, a brief or proposed findings. Montgomery County not only failed to respond to this Court's order, but had also failed to appear at any hearing since we permitted intervention.

At the request of the Senate Plaintiffs and the MALDEF Intervenors, we scheduled an evidentiary hearing for November 21, 1983, to supplement the record on the 1983 House and Senate plans. The Senate Plaintiffs sought an adjudication of the lawfulness of the entire 1983 Senate plan, and, at least initially, the MALDEF Intervenors asserted that the House districts for West Texas in the vicinity of Del Rio, as well as the Dallas County districts, violated the constitution and section 2 of the Voting Rights Act.[2]

On the morning of the hearing, the issues narrowed further. The House and Senate Plaintiffs appeared at the hearing and offered a stipulation to dismiss them from the action. We accepted the stipulation and, on December 22, 1983, entered a consent decree establishing the 1983 Senate plan as the permanent plan for Texas Senatorial elections. The MALDEF Intervenors, on the other hand, abandoned their claim concerning the West Texas districts and supplemented the record only as to the allegedly discriminatory results of the Dallas County House districts.

Briefing preceded and followed the November, 1983 hearing. The State Defendants and MALDEF Intervenors have fully addressed the constitutional and statutory arguments. Although certain districts in the House plan have been altered since the LRB originally drew the lines in 1981, the Dallas districts have remained unchanged.[3] Thus, on three occasions—at the January, 1982 hearing on the merits, at the March, 1982 hearing on temporary plans, and at the November, 1983 hearing addressed primarily to section 2 of the Voting Rights Act—we have heard evidence on the purpose and effect of the Dallas districting.

## II. THE DALLAS COUNTY DISTRICTS.

Before we consider the merits, a review of the Dallas County districts will place the parties' claims in perspective. This review, which will comprise findings of fact, will set forth the following: a description of the county population, a description of the distribution of the hispanic population within

---

**2.** The MALDEF Intervenors stated that the following issues of fact and law remained:

A. *Issues of Fact*

1. Whether the totality of circumstances regarding Texas House of Representative [sic] Districts in Dallas County results in the inability of Mexican-Americans in Dallas County to elect candidates of their choice to the Texas Legislature.

2. Whether the 1983 Texas House of Representative [sic] Districts for Dallas County were adopted with the intent of discriminating against the Mexican American voters in Dallas County.

3. Whther [sic] the totality of circumstances regarding Texas House of Representative [sic] Districts for the Del Rio/West Texas area results in the inability of Mexican Americans in the Del Rio/West Texas area to elect candidates of their choice to the Texas Legislature.

4. Whether the 1983 Texas House of Representative [sic] Districts for the Del Rio/West Texas area were adopted with the intent of discriminating against Mexican American voters of West Texas.

B. *Issues of Law*

1. Whether the Texas House of Representative [sic] Districts for Dallas County and/or West Texas result in a discriminating [sic] impact on the Mexican American voters of those areas in violation of Section 2 of the Voting Rights Act 42 U.S.C. § 1973.

2. Whether the Texas House of Representative [sic] Districts for Dallas County and/or West Texas dilute Mexican American voting strength in those respective areas in violation of the 14th Amendment to the United States Constitution.

**3.** To reach their present configurations, the districts for the Texas House have passed through several versions. The legislature drew the original plan, H.B. 960, Tex.Civ.Stat.Ann. art. 195a–7 (Vernon Supp.1982), but the Texas Supreme Court struck down the plan as violating Tex. Const. art. III, § 26, which prohibits the unnecessary splitting of counties. *Clements v. Valles,* 620 S.W.2d 112, 114–15 (Tex.1981). The LRB then drew the districts that gave rise to this litigation. This Court temporarily adopted the LRB House plan with minor modifications to the districts in two counties after the Department of Justice objected to the original LRB House plan. The 1983 House plan consists of the LRB House plan with the court-ordered modifications.

the county and a description of the effect of the past, present and proposed districting plans on Dallas County's hispanics.

### A. Dallas County and its Hispanic Population.

As in the State of Texas generally, the population of Dallas County grew between the 1970 and 1980 censuses. The 1970 county population of 1,327,320 had, by 1980, grown to 1,556,390. The rate of growth in the county of 17.3%, however, lagged behind the 27.1% rate of growth in the State as a whole. Accordingly, whereas the 1970 districting plan had allocated 18 districts to Dallas County, Dallas County's share of the 1980 State's House of Representatives districts declined. Thus, a "one-man, one-vote" reapportionment in 1980 would entitle the county to only 16.4 districts.[4] In light of the Texas constitutional requirement of maintaining the integrity of county lines whenever the United States Constitution will permit it, see Clements v. Valles, 620 S.W.2d 112, 113–15 (Tex.1981), the drafters of the redistricting plans faced the choice of dividing Dallas County into 16 slightly overpopulated districts or 17 slightly underpopulated districts.[5] The 1983 House plan chooses the latter alternative, as have all the plans presently before us.

The rate of growth in the county of the anglo, black and hispanic populations was not uniform. The minority populations in

Dallas County grew more rapidly than the anglo population. Thus, in 1970, the black population of 220,357 comprised 16.6% of the county population. By 1980, the black population had increased by 30.5% to 287,-541, and comprised 18.5% of the county population. In 1970, the hispanic population of 88,652 comprised 6.7% of the county population. By 1980, the hispanic population had increased by 74.3% to 154,560, and comprised 9.9% of the county population. Parenthetically, we note that the census method of identifying hispanics changed between the 1970 and 1980 censuses, so that the numbers given for 1970 and 1980 are not entirely comparable. See II Trial Transcript 414–15 (testimony of Dudley Poston).

Theoretically, the 1980 combined minority population would suffice to form almost five House districts. The black population alone could fill out slightly more than three districts. The hispanic population, on the other hand, could fill out slightly more than one and one half districts.[6] Naturally, these calculations take no account of the geographic distribution of the minority population in the county.

The minority population, for the most part, forms communities in the central and southern portions of the City of Dallas. Approximately 48,000 blacks and hispanics, however, live scattered throughout the predominately anglo communities in north Dal-

---

**4.** The 1980 census sets the Texas population at 14,229,191. With 150 House districts, an ideally apportioned district would contain 94,861 persons.

**5.** Dividing the county into 16 districts would result in districts containing approximately 97,-284 persons. Dividing the county into 17 districts would result in districts containing approximately 91,561 persons. Although a decision to apportion all of Dallas County into 16 or 17 districts necessarily creates districts varying 2.0% to 3.5% from the ideal, the Texas Supreme Court explicitly disapproved a split of Dallas County and seven other counties in the original legislative plan, Tex.Civ.Stat.Ann. art. 195a–7, because "[the State] failed to prove that the retention of surplus populations within the boundaries of the eight counties would result in impermissible deviations." Clements v. Valles, 620 S.W.2d at 115.

**6.** The exact number of districts to which the minority population would be entitled under this strictly proportional analysis depends on the method of calculation. The black population could fill out 3.03 "ideal" districts while the hispanic population could fill out 1.62 "ideal" districts. IV Trial Transcript 1090 (testimony of Paul Ragsdale). Assuming that these figures do not double count persons who checked both black and hispanic on the census form, the combined minority population could fill out 4.66 "ideal" districts. In a 17-district apportionment of Dallas County, the black population could fill out 3.14 districts while the hispanic population could fill out 1.68 districts. Again, assuming no double count, the combined minority population could fill out 4.82 districts. Id. at 1091 (testimony of Paul Ragsdale).

las County.[7] Otherwise, the black and hispanic populations are mingled in an area running along the line of the Trinity River, through downtown Dallas and into the southern part of the City of Dallas.[8]

Although the black and hispanic populations live in close proximity to each other, the hispanic population in Dallas County, according to testimony adduced by the MALDEF Intervenors, has formed several identifiable neighborhoods.[9] One neighborhood, known as "Little Mexico" consists of an area slightly northwest of downtown Dallas and southeast of Love Field.[10] A second neighborhood, called "New Little Mexico" lies immediately northeast of Downtown Dallas and to the east of "Little Mexico."[11] Another neighborhood, known as "El Poso," is located in the vicinity of downtown Dallas.[12] Three additional neighborhoods, called "Los Altos La Vajate," "Los Santos" and the "Ledbetter" area are located in west Dallas.[13] In addi-

---

**7.** Thus in the 1983 House plan, the six districts that run along the northernmost part of Dallas County have the following minority populations:

| | |
|---|---|
| District 98: | 8,342 |
| District 99: | 8,062 |
| District 101: | 13,047 |
| District 112: | 4,313 |
| District 113: | 6,079 |
| District 114: | 8,467 |

1983 Joint Exh. 5. Aside from isolated pockets of 5000 persons in northeast Dallas County and 3500 persons in north Dallas County, the minority population in north Dallas County is dispersed.

**8.** Nearly 350,000 blacks and hispanics reside in the seven districts of the 1983 House plan that run through central and southern Dallas County. In those districts, there are the following minority populations:

| | |
|---|---|
| District 100: | 71,568 |
| District 103: | 51,078 |
| District 104: | 8,750 |
| District 107: | 50,150 |
| District 108: | 29,448 |
| District 110: | 66,382 |
| District 111: | 70,163 |

1983 Joint Exh. 5.

**9.** The testimony concerning hispanic neighborhoods came principally from Joe May, who drafted MALDEF's most recent alternative plan—the "MAY–MALDEF" plan. For the most part, May described the hispanic neighborhoods imprecisely. Where he gave specific geographic referents for the neighborhoods, the referents usually consist of voting precinct numbers. In at least one instance, the area described does not have a heavy hispanic population concentration. By referring to precinct numbers, May has made it difficult not only to gauge the exact hispanic population of these areas, which we can derive only from the census tract breakdown in the district statistical summaries, *e.g.*, 1983 Joint Exh. 5, but also to correlate these neighborhoods with the black population concentration, which we could have derived from the Dallas demographic map. Any imprecisions in the descriptions in this opinion of these neighborhoods, imprecisions which we readily acknowledge may exist, result from shortcomings in May's testimony.

**10.** *See* VI Trial Transcript 92 (testimony of Joe May). May described the area as encompassing parts of voting precincts 3303, 3304 and 3386. From the Dallas demographic map, this section of the county varies from 20% to 80% hispanic, and the northwestern portion of the area has a mixed population of 20% to 40% black. From the statistical breakdowns of the plans, the census tracts in the area May has described have an hispanic population of about 4200. *See* 1983 Joint Exh. 5 (census tracts 4 01, 5, 18 & 19).

**11.** *See* VI Trial Transcript 87–88. May stated that the area consists of voting precincts 3312, 1213, along with parts of voting precincts 3301, 2254 and 3307. *See* 1983 P–I Exh. 10. The Dallas demographic map indicates that this area is from 20% to 60% hispanic. The 1983 House plan statistical breakdown suggests that the area contains approximately 14,000 hispanics. *See* 1983 Joint Exh. 5 (census tracts 8, 9, 10, 12, 15 01, 15 02 & 24).

**12.** *See* VI Trial Transcript 90–91 (testimony of Joe May). May offered no voting precinct numbers for the "El Poso" community. The map of voting precincts with 40% or more hispanic population, 1983 P–I Exh. 10, shows no hispanic voting precinct in the area May described. We decline to speculate about the size and exact location of the "El Poso" community.

**13.** *See* VI Trial Transcript 92–93. The three neighborhoods, according to May, consist of voting precincts 4411 and 3353. Precinct 3353, according to May, forms the dividing line between the Los Santos and the Los Altos La Vajate communities. We note that high hispanic-population voting precincts lie adjacent to 3353. We assume for present purposes that these precincts are part of the same neighborhoods. If so, according to the Dallas demographic map, the Ledbetter area has over 80% hispanic population, and the other two communities have from 20% to 80% hispanic population with a mixed black population of from 20%

tion, the area around Love Field has a substantial hispanic population.[14]

Although these neighborhoods may be predominantly and identifiably hispanic, they form separate enclaves of hispanic population rather than one contiguous hispanic community. In most instances, the hispanic neighborhoods abut areas whose populations are a mixture of black and hispanic, predominately black or largely anglo. Generally, black areas are wedged between the three hispanic neighborhoods north of downtown Dallas—Little Mexico, New Little Mexico and the area near Love Field—and the three neighborhoods in west Dallas—Ledbetter, Los Santos and Los Altos La Vajate. Moreover, the three hispanic neighborhoods within west Dallas, as

well as the three to the north of downtown Dallas, are not all contiguous to one another. For example, the Ledbetter area is isolated from the other two west Dallas neighborhoods; it adjoins a black area with less than 40% hispanic population on the east, anglo areas with less than 40% hispanic population on the south and northwest, a black area on the northeast, and an anglo area on the west. As the county demographic map illustrates, the hispanic population consists of six scattered areas rather than a cohesive whole.[15] 1983 P–I Exh. 10A. Indeed, the hispanic neighborhoods are sufficiently dispersed such that a serious question exists whether any single district could completely encompass them.[16]

to 80%. According to the LRB House plan statistical breakdown, the Ledbetter area has an hispanic population of slightly over 5600, *see* 1983 Joint Exh. 5 (census tract 106), and the other two communities, combined, appear to have an hispanic population of about 16,600. *See* 1983 Joint Exh. 5 (census tracts 20, 42, 43, 47, 48, 50, 51, 52 & 101).

**14.** About 3500 hispanics live in the Love Field area. *See* 1983 Joint Exh. 5 (census tract 4 03).

**15.** With one exception, the neighborhoods exclusively abut other non-hispanic areas. Following is a list of the census tracts that adjoin each neighborhood with the percentage of the predominate population group in each census tract. The figures are derived from Joint Exh. 5. For the purposes of illustration, we have used the term "anglo" as a substitute for the exhibit category "other," which includes all those who are neither black nor hispanic. We include this breakdown with the caveat that any imprecisions in the descriptions of the hispanic neighborhoods and the surrounding areas derives from the vagueness of the testimony concerning the locations of the hispanic neighborhoods.

LITTLE MEXICO [includes census tracts 4 01, 5, 18 and 19]: tracts 4 03 (Love Field) (60.21% hispanic); 4 02 (51.70% anglo); 6 03 (82.58% anglo); 6 04 (84.45% anglo); 7 01 (62.66% anglo); 17 02 (82.62% black); 21 (58.18% anglo); and 100 (62.46% black).

NEW LITTLE MEXICO [includes census tracts 8, 9, 10, 12, 15 01, 15 02, and 24]: tracts 1 (split tract) (90% + anglo); 3 (84.94% anglo); 7 01 (62.66% anglo); 7 02 (79.85% anglo); 11 01 (70.37% anglo); 13 01 (69.64% anglo); 13 02 (53.23% anglo); 14 (62.14% anglo); 16 (92.98% black); 22 01 (73.53% anglo); 22 02 (62.39% black); 23 (80.72% black); 25 (87.23% black); 26 (52.10% black);

81 (90.33% anglo); and 122 03 (split tract) (65% + anglo).

LOS ALTOS LA VAJATE AND LOS SANTOS [includes census tracts 20, 42, 43, 47, 48, 50, 51, 52, and 101]: tracts 32 02 (76.61% anglo); 41 (94.95% black); 44 (66.33% anglo); 45 (64.13% anglo); 46 (64.48% anglo); 49 (95.06% black); 53 (66.50% anglo); 54 (75.17% black); 62 (47.16% anglo, 41.98% black); 63 02 (84.04% anglo); 100 (62.46% black); 102 (89.08% black); and 104 (80.71% black).

LEDBETTER [includes census tract 106]: tracts 100 (62.46% black); 105 (split tract) (60% + black); 107 (60.88% anglo); 148 02 (75.33% anglo); 151 (90.13% anglo); and 158 (87.75% anglo).

LOVE FIELD [includes census tract 4 03]: tracts 4 01 (western edge of Little Mexico) (56.16% hispanic); 4 02 (51.70% anglo, 22.08% black); 6 01 (56.82% anglo); 71 02 (78.81% black); 72 (67.46% anglo); 73 02 (88.21% anglo); 98 02 (66.12% anglo); and 100 (62.46% black).

**16.** One could debate whether the MAY–MALDEF plan actually encompasses all the hispanic neighborhoods in its hispanic district, district 113. The answer depends on how one defines "neighborhood," and we have heard no testimony on this definitional question. We note, however, that the MAY–MALDEF plan splits up sixteen census tracts just in drawing its hispanic district. In most instances it attempts to extract the "most hispanic" block groups from the split census tracts. Whether or not the plan succeeds in preserving all the neighborhoods while cutting its meandering path through the city of Dallas is not, in our view, crucial. We are forced to wonder just how much these areas truly constitute "neighborhoods," as May testified, much less one cohesive "community," when a plan must draw such fine lines before

## B. The Districting Plans.

Partially as a consequence of dispersed nature of the hispanic populations, Dallas has never had an hispanic-dominated House district. With one exception, the proposed plans do not draw a district with an hispanic majority. One plan—the "MAY–MAL-DEF" plan—creates a district with only a bare hispanic population majority. The voting age population for that district, however, is only 43.66% hispanic. While the other plans that we have reviewed have in common their lack of a hispanic district, the plans differ substantially in their demographic and political consequences.

### 1. The Previous Plan.

Before the 1980 census was taken, Dallas County was divided into 18 single-member House districts. The Texas Legislature had drawn the districts pursuant to the order of the United States District Court for the Western District of Texas after that court struck down a multi-member district plan for the county in 1971. *See Graves v. Barnes*, 343 F.Supp. 704 (W.D. Tex.1972), *aff'd in part and rev'd in part sub nom. White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). The *Graves* plan had divided the predominately minority areas in and around the City of Dallas into six districts: 33C, 33F, 33G, 33K, 33N and 33O.

These six districts were heavily populated with minorities. District 33C consisted of portions of the black population in west Dallas and included the hispanic population around Love Field. District 33F, which lay to the south of District 33C, took in most of the area where, according to the MALDEF Intervenor's testimony, the "Los Altos La Vajate" and "Los Santos" neighborhoods are located, together with adjacent black and anglo areas. Three districts, 33G, 33N and 33O, ran through the predominately black areas of south Dallas. *See* 1983 Joint Exh. 2.

determining if a particular group of hispanics living in roughly the same area is indeed a part

The *Graves* plan contained four districts with substantial hispanic populations. These districts varied from one with 19.8% hispanic population to one with 31.3% hispanic population. A more complete breakdown of the minority populations in these districts appears in Table A.

TABLE A

Minority Population In *Graves* Plan House Districts
(In Percentages)

| District Number | Black Population | Hispanic Population | Minority [a] Population |
|---|---|---|---|
| 33C | 53.3 | 20.6 | 73.9 |
| 33F | 22.2 | 31.3 | 53.5 |
| 33G | 57.9 | 8.0 | 65.9 |
| 33K | 31.7 | 27.1 | 58.8 |
| 33N | 85.4 | 2.4 | 87.8 |
| 33O | 63.0 | 19.8 | 82.8 |

a. Black plus hispanic adjusted to correct double count for those who checked both.

(Source: 1983 Joint Exh. 2.)

In 1980, these district configurations had resulted in the election of three black Representatives. Representative Sam Hudson was the incumbent elected from district 33C in west Dallas. II Trial Transcript 465–66 (testimony of George Dillman); II Trial Transcript 539 (testimony of Lee Jackson). Representative Paul Ragsdale was the incumbent elected from district 33N in south Dallas. II Trial Transcript 539 (testimony of Lee Jackson); IV Trial Transcript 1082 (testimony of Paul Ragsdale). Representative Lanelle Cofer was the incumbent from district 33O in south Dallas. *Id.* While the *Graves* plan was in force, one other district, district 33G in west Dallas, had, on two occasions, elected a black Representative. II Trial Transcript 539.

### 2. The 1983 House Plan.

Despite the growth of minority population in Dallas County generally, the 1980 census revealed that the districts in the City of Dallas were substantially underpopulated. Together, the six minority districts in central Dallas listed in Table A, *supra*, were approximately 160,000 persons

of the neighborhood.

short of the population necessary for six "ideal" districts. District 33C alone fell short of an "ideal" district by about 40%, or 38,000 persons. District 33O fell approximately 34% short of an "ideal" district. IV Trial Transcript 1089 (testimony of Paul Ragsdale).

The 1983 House plan, like all of the plans submitted to this Court, redrew the minority-dominated areas in central and southern Dallas County into five districts. In essence, the 1983 House plan dismantled one of the *Graves* districts in the City of Dallas to build up the minority population in adjacent districts. District 100 encompasses most of the population of former district 33C in west Dallas and extends southeast into predominately black areas that formerly comprised a part of district 33O. *See* II Trial Transcript 556 (testimony of Lee Jackson); 1983 Joint Exh. 2; 1983 P–I Exh. 4. District 103 consists in part of former

district 33F; the district also extends further west, and includes small portions of former districts 33G and 33O on the south and east. *See* 1983 Joint Exh. 2; 1983 P–I Exh. 4. District 107, in large measure, includes former district 33K together with a portion of former district 33C. 1983 Joint Exh. 2; 1983 P–I Exh. 4. District 110 includes most of former district 33N, and extends further south. 1983 Joint Exh. 2; 1983 P–I Exh. 4. District 111 includes most of former district 33G, part of former district 33O, and an area to the west of Dallas that had not formerly been a part of the central city district. 1983 J. Exh. 2; 1983 P–I Exh. 4. A breakdown of the minority population and voting age population appears for each of the five minority districts under the 1983 House plan in Table B along with the same information for the three MALDEF plans.

TABLE B

Comparison of Black, Hispanic and Minority Composition of Selected
Dallas County Districts under 1983 House Plan
and MALDEF Plans (in percentages)

LEGEND: Pop. = Population
VAP = Voting Age Population

I. 1983 House Plan

| District | Black Pop. | Black VAP | Hispanic Pop. | Hispanic VAP | Minority [a] Pop. | Minority [a] VAP |
|---|---|---|---|---|---|---|
| 100 | 65.88 | 61.86 | 12.49 | 11.06 | 78.03 | 72.77 |
| 103 | 20.73 | 18.63 | 35.54 | 28.98 | 56.08 | 47.52 |
| 107 | 26.65 | 24.15 | 29.01 | 23.81 | 55.33 | 47.78 |
| 110 | 69.90 | 65.41 | 3.57 | 3.24 | 73.18 | 68.44 |
| 111 | 65.73 | 60.91 | 10.10 | 8.56 | 75.50 | 69.26 |

II. MALDEF I House Plan

| District | Black Pop. | Black VAP | Hispanic Pop. | Hispanic VAP | Minority Pop. | Minority VAP |
|---|---|---|---|---|---|---|
| 100 | 63.63 | 58.43 | 12.17 | 10.98 | 75.44 | 69.22 |
| 103 | 22.67 | 20.23 | 42.50 | 36.50 | 64.98 | 56.65 |
| 107 | 37.45 | 34.31 | 23.37 | 19.46 | 60.47 | 53.63 |
| 110 | 71.47 | 65.19 | 3.27 | 2.84 | 74.46 | 67.83 |
| 111 | 61.15 | 54.74 | 9.83 | 8.07 | 70.68 | 62.65 |

III. MALDEF II House Plan

| District | Black Pop. | Black VAP | Hispanic Pop. | Hispanic VAP | Minority Pop. | Minority VAP |
|---|---|---|---|---|---|---|
| 100 | 65.39 | 59.44 | 10.39 | 9.64 | 75.41 | 68.88 |
| 103 | 27.01 | 24.96 | 40.30 | 34.51 | 67.06 | 59.29 |
| 107 | 26.28 | 23.28 | 24.75 | 20.32 | 50.76 | 43.50 |
| 110 | 65.68 | 62.58 | 4.69 | 4.03 | 70.09 | 66.42 |
| 111 | 65.78 | 61.73 | 5.18 | 4.43 | 70.65 | 65.96 |

III. MAY–MALDEF House Plan

| | | | | | |
|---|---|---|---|---|---|
| 103 | 31.59 | b | 16.61 | b | 48.20 c | b |
| 108 | 69.03 | b | 6.17 | b | 75.20 c | b |
| 110 | 67.38 | b | 7.15 | b | 74.53 c | b |
| 111 | 67.79 | b | 3.38 | b | 71.17 c | b |
| 113 | 14.18 | 14.29 | 51.43 | 43.66 | 65.61 c | 57.83 |

a. Minority equals black plus hispanic, adjusted for those who checked both.

b. The MALDEF Intervenors have not supplied this information.

c. Total not adjusted for those who checked both black and hispanic.

(Source: 1983 Joint Exh. 2; 1983 P–I Exhs. 3A, 37.)

Like the *Graves* plan, the 1983 House plan does not unite the six pockets of hispanic population. Two separate districts contain substantial hispanic populations. District 107—which contains "Little Mexico" and "New Little Mexico"—has an hispanic population comprising 29.01% of the total district population. District 103—which contains the Ledbetter area, and most of the population in the Los Altos La Vajate and Los Santos neighborhoods—has an hispanic population comprising 35.54% of the total district population. In both of these districts, the black and hispanic populations combine to form a majority. In neither district, however, does the combined black and hispanic population make up a majority of the voting age population.

The configuration of the 1983 House districts, like the *Graves* plan, resulted in the election in 1982 of three black Representatives. Representative Sam Hudson, formerly of district 33C, won re-election in district 100. Representative Paul Ragsdale, formerly of district 33N, won re-election in district 110. Although the black incumbent from former district 33O did not run, a black Representative, Jesse Oliver, was elected from district 111.

*3. The MALDEF Plans.*

The MALDEF Intervenors have offered three plans—the "MALDEF I plan," the "MALDEF II plan" and the "MAY–MALDEF plan"—that have a common objective: to create an hispanic-dominated district. Each plan creates five districts in the areas of minority concentration in and around the City of Dallas. In one of the districts in each plan, hispanics would potentially be a politically decisive force. In the MALDEF I and MALDEF II plans, the key districts contain an hispanic population plurality together with a combined black and hispanic population majority. In the MAY–MALDEF plan, the hispanic district has a bare hispanic population majority together with a combined black and hispanic population majority.

Although each of these plans achieves, at least in theory, an hispanic-dominated district by slightly different means, the line-drawing in each plan dealt with similar obstacles. The most serious problem, of course, arises because only twelve of the census tracts in Dallas County (143 04, 4 03, 30, 31 02, 33, 106, 4 01, 8, 10, 19, 24, 47) contain more than 50% hispanic population. 1983 Joint Exh. 5. Even these twelve census tracts, which cumulatively contain slightly more than 21,000 hispanics, cannot all be placed in a single contiguous district. Only one plan—the MAY–MALDEF plan—includes the four largest of these twelve tracts in one district, and even that plan splits two of these tracts.

Still another problem arises from the first. The MALDEF plans all attempt to unite in one district at least part of census tract 106, an 85.06% hispanic area containing about 5600 hispanics, and census tract 4 03, a 60.21% hispanic area containing about 3300 hispanics. 1983 Joint Exh. 5. To accomplish this union, the district must traverse an area that forms a part of 1983 House district 100, and that formerly was a part of district 33C from the *Graves* plan. Although the area—census tract 100—itself contains a black population of only 1446 persons, the area either adjoins or gives access to other areas (census tracts 6 01, 71 02, 102 and split tract 105) that have additional black populations totaling approximately 11,200 persons. No district configuration for a black district that excluded census tract 100 could join these other

areas with the rest of district 100. In short, the line drawers are compelled to make a choice between uniting black or hispanic populations.

Finally, the MALDEF plans all exclude the same predominately anglo areas from their hispanic-dominated districts. Testimony adduced by the MALDEF Intervenors suggested that these affluent anglo neighborhoods, which are a part of one of the most strongly hispanic districts under the 1983 House plan, had a particularly strong propensity to oppose minority candidates. These areas, referred to as "Kessler Park" and "Stevens Park," adjoin the predominately hispanic areas in west Dallas. VI Trial Transcript 99, 102–03 (testimony of Joe May); id. at 66, 73 (testimony of Trinidad Garza).[17] The three MALDEF plans cut a careful line around these anglo neighborhoods and move them into the predominately black district to the south.

The three plans also have in common their effect on the hispanic population. Like the 1983 House plan, the MALDEF plans place parts of each of the six pockets of hispanic population into at least two separate districts. The three plans differ chiefly in their respective percentages of hispanic population in the hispanic-dominated districts and their effect on adjacent black districts. The MAY–MALDEF plan is unique in that it embraces at least part of the identifiable hispanic communities in north Dallas and west Dallas. The plan achieves an hispanic population majority only by creating a district that runs three tentacle-like corridors through west and central Dallas. A more complete breakdown of the minority populations in each district appears in Table B.

III. THE PARTIES' CONTENTIONS.

The MALDEF Intervenors urge this Court to strike down the Dallas County districts in the 1983 House plan because they violate section 2 of the Voting Rights Act by diluting hispanic voting strength, and because the plan's drafters contra-

vened the constitution by purposefully creating that dilution. The configurations of the districts, in the MALDEF Intervenors' estimation, combine with political conditions in Dallas County to ensure that the hispanic population enjoys less opportunity than others to elect candidates of their choice. Purportedly, the State drafted the plan with the transparent intent to protect incumbents by harming Dallas hispanics.

The Dallas districts, the MALDEF Intervenors maintain, fragment a cohesive hispanic community. The plan allegedly joins hispanic neighborhoods to politically hostile anglo neighborhoods with the result that the largest groups of hispanic voters in Dallas County are rendered politically impotent. As the MALDEF Intervenors see the matter, its alternative plans evidence the ease with which the districting authority could have designed at least one district in which hispanics could have turned an undesired incumbent out of office and installed a candidate of their choice.

The MALDEF Intervenors assert that the failure to draw such a district must be regarded as discriminatory. Past political discrimination and the lingering effects of general discrimination against hispanics have allegedly rendered them politically inactive. According to the MALDEF Intervenors, political polarization, evidenced by bloc voting, leads to a predictable result for hispanics—virtual disenfranchisement. As one consequence, the MALDEF Intervenors point out, no hispanic has ever served in the Texas Legislature as a Representative of Dallas County.

The State, in the MALDEF Intervenors' view, can muster no policy adequate to justify the impact of the 1983 House plan on hispanics. The sole justification of the plan allegedly derives from incumbency. While the MALDEF Intervenors conceded that the State Defendants may legitimately consider the political effects of redistricting, the 1983 House plan purportedly achieves its political ends by purposefully

---

**17.** From the description of the neighborhood, we assume that the witnesses were referring to the largely anglo census tracts adjacent to the hispanic neighborhoods identified as Los Altos La Vajate and Los Santos.

gerrymandering a natural hispanic population concentration.

Naturally, the State Defendants deny the MALDEF Intervenors' characterization of the plan's design and result. The geographic dispersion of the hispanic population, the State Defendants contend, contradicts any notion that the plan fragments or "cracks" any community of hispanics that is cohesive. Furthermore, in the view of the State Defendants, the political climate of Dallas is not so inhospitable to hispanics as to oblige the State to construct artificially a district that ensures local hispanic hegemony. The State Defendants also argue that the MALDEF Intervenors misconstrue the plan's purpose. The plan, as the State Defendants emphasize, aims at maintaining continuity and avoiding retrogression of the voting strength of blacks.

According to the State Defendants, the district lines neither deviate from reasonable configurations nor split up hispanic neighborhoods. The hispanic neighborhoods, which are separated by as much as nine miles, have allegedly been consolidated, where possible, in a reasonable manner. In the State Defendants' view, the MALDEF Intervenors cannot, under the evidence, argue that the 1983 House plan gerrymanders. Rather, the State Defendants assert that the MALDEF Intervenors complain only of the plan's failure to maximize hispanic voting strength by carving up other natural population patterns.

Moreover, the State Defendants take the view that the MALDEF Intervenors have failed to demonstrate that the Dallas County electoral system is rigged against hispanics. The evidence, under the State Defendants' construction, establishes no monolithic polarization in voting among population groups that might transform hispanic status as a population minority into a de facto withdrawal of the right to vote. Nor does the evidence, the State Defendants assert, show hispanic political powerlessness despite the frequent failure of hispanic candidates at the polls.

Finally, the State Defendants disagree with the MALDEF Intervenors' interpretation of State policy. Incumbency, according to the State Defendants, provides only a part of the plan's rationale. The State's policy also allegedly advances related interests—continuity with the previous districting plan, and the preservation of Representative-constituent relationships. In addition, the State Defendants point out that the drafters had to consider the effect of the plan on black voters. The State Defendants allege that the MALDEF plans jeopardize black interests; all of the MALDEF plans pair an anglo incumbent against the most junior black Representative. One of the plans, the MAY–MALDEF plan, eviscerates the district of yet another black Representative. The State Defendants assert that this Court should defer to the legislative judgment about how best to resolve these conflicting interests fairly.

## IV. THE APPLICABLE STANDARDS.

Since the Supreme Court first forayed into the "political thicket" of reapportionment in the 1960s, courts have struggled with the task of developing manageable standards to determine when the process of line-drawing becomes invidiously discriminatory. On one hand, courts have not tolerated political systems that effectively exclude minority voters from the democratic processes. *See, e.g., White v. Regester*, 412 U.S. 755, 765–70, 93 S.Ct. 2332, 2339–41, 37 L.Ed.2d 314 (1973); *Fortson v. Dorsey*, 379 U.S. 433, 439, 85 S.Ct. 498, 501, 13 L.Ed.2d 401 (1965) (dictum); *Zimmer v. McKeithen*, 485 F.2d 1297, 1304–07 (5th Cir.1973) (en banc), *aff'd on other grounds sub nom. East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). Yet, on the other hand, courts have consistently eschewed the notion that the United States Constitution secures to any group of citizens the right to obtain political representation in proportion to its numbers. *E.g., Whitcomb v. Chavis*, 403 U.S. 124, 156–57, 91 S.Ct. 1858, 1875–76, 29 L.Ed.2d 363 (1971). In the present case, we are presented with two variations on this theme of how to draw the line between securing the right to partici-

pate politically and avoiding government by quota.

Section 2 of the Voting Rights Act, 42 U.S.C.A. § 1973, as amended in 1982, and the fourteenth amendment to the United States Constitution offer related remedies for minority groups that have suffered interference with their right to vote as a result of the voting practices or procedures in their electoral system.[18] To obtain either remedy, a plaintiff must show that, in the totality of circumstances, "the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." *White v. Regester*, 412 U.S. at 766, 93 S.Ct. at 2339; *see* 42 U.S.C.A. § 1973b. Under neither test does the failure of a minority group to translate its voting strength into proportional representation suffice to establish a lack of access. *Whitcomb v. Chavis*, 403 U.S. at 156–60, 91 S.Ct. at 1875–77; 42 U.S.C.A. 1973b.

Both the constitutional jurisprudence and section 2 of the Voting Rights Act have employed a group of objective evidentiary factors to measure the discriminatory effect of a voting practice or procedure on minority voters. *See White v. Regester*, 412 U.S. at 766–69, 93 S.Ct. at 2339–41; *Zimmer v. McKeithen*, 485 F.2d at 1305–06; S.Rep. No. 417, 97th Cong., 2d Sess. 28–29, *reprinted in*, 1982 U.S.Code Cong. & Ad.News 177, 206–07 (report of

Committee on the Judiciary endorsing 1982 amendments to the Voting Rights Act). The factors include historical inquiries such as the effects of past discrimination, indicia of race or ethnic-conscious politics such as polarized voting, and formal obstacles to minority success at the polls such as anti-single shot voting requirements or majority vote rules. The objective factors aid in distinguishing mere political failure from unlawful deprivation of political participation.

Despite the common purpose and evidentiary focus, section 2 of the Voting Rights Act demands a less exacting burden of proof. To find that an electoral system violates the constitution, a court must determine that the discriminatory impact of the system derived from the intent to bring about that result. *See Rogers v. Lodge*, 458 U.S. 613, 616–22, 102 S.Ct. 3272, 3275–78, 73 L.Ed.2d 1012 (1982); *City of Mobile v. Bolden*, 446 U.S. 55, 66–71, 100 S.Ct. 1490, 1499–01, 64 L.Ed.2d 47 (1980) (plurality opinion of Stewart, J.); *accord id.* at 99–101, 100 S.Ct. at 1516–1517 (White, J., dissenting). The objective factors in *White* and *Zimmer* may, but do not necessarily, support an inference of intent. *Compare City of Mobile v. Bolden*, 446 U.S. at 72–74, 100 S.Ct. at 1502–1503 (plurality opinion of Stewart, J.) (objective factors "far from proof" of discriminatory purpose) *with Rogers v. Lodge*, 458 U.S. at 623–27, 102 S.Ct. at 3279–81 (finding evidence, based principally on objective factors, sufficient to support inference of discriminatory in-

---

**18.** Some courts have identified two separate theories under which a plaintiff might show that a redistricting plan discriminates invidiously. *E.g., Zimmer v. McKeithen*, 485 F.2d at 1304. According to these cases, a plaintiff may show either a "racially motivated gerrymander"—*Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) is the paradigmatic case—or an apportionment scheme that operates to cancel out the voting strength of a minority group. *E.g., White v. Regester*, 412 U.S. at 766–70, 93 S.Ct. at 2339–41. The two lines of cases were theoretically distinct because the latter, or "dilution," line of cases did not, under earlier interpretations, require a showing of intent, while a racial gerrymander did contem-

plate a showing of intent. *See Zimmer v. McKeithen*, 485 F.2d at 1304.

We do not think that this distinction has clearly survived later developments in the law. Thus, some courts have treated what were essentially racial gerrymander claims as voting dilution cases. *See e.g., Kirksey v. Board of Supervisors*, 554 F.2d 139, 142–43 (5th Cir.) (en banc) (claim that single-member district lines fragmented cohesive black community), *cert. denied*, 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977). Furthermore, a dilution claim brought under the constitution must now include proof of discriminatory intent. *Rogers v. Lodge*, 458 U.S. 613, 616–19, 102 S.Ct. 3272, 3275–77, 73 L.Ed.2d 1012 (1982).

tent). Under section 2 of the Voting Rights Act, however, a plaintiff can establish a violation by showing the discriminatory result, which in turn can be proven through the aggregate of the objective factors. *See* 42 U.S.C.A. § 1973(b); S.Rep. No. 417 at 29–30 & n. 118, 1982 U.S.Code Cong. & Ad.News at 206–07 & n. 118.

Although the objective factors are relevant to both the constitutional and statutory inquiry, each test relies upon them for different inferences. Accordingly, we must discuss the significance of these factors under the constitutional and statutory tests. This discussion will also consider how the configurations of single-member districts can constitute a discriminatory voting practice or procedure.

### A. The Section 2 Test.

■ Before *Bolden* and the lower court cases that anticipated its holding, the law of voting dilution had never expressly required a showing of discriminatory intent. To harmonize the law of voting dilution with the standard prevailing in other equal protection cases,[19] *see generally Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), the Supreme Court in *Bolden* explicitly read an

intent requirement into the voting dilution line of cases for the first time.[20] Section 2 represents Congress' judgment that focusing on intent diverts attention from the crucial issue—equality of access. S.Rep. No. 417 at 16, 1982 U.S.Code Cong. & Ad. News at 193.

Originally, section 2 of the Voting Rights Act had merely tracked the wording of the fifteenth amendment,[21] and the Supreme Court read its provisions as coextensive with the constitution. *Bolden,* 446 U.S. at 60–61, 100 S.Ct. at 1495–1496 (plurality opinion of Stewart, J.). In June of 1982, Congress amended the Act to prohibit electoral systems that had invidious results even though the systems might not clearly have been installed in order to discriminate. The Act presently reads:

(a) No voting qualification or prerequisite to voting, standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title [which applies the Act's protection to members of any lan-

**19.** Originally, the MALDEF Intervenors pleaded a cause of action under the fifteenth amendment. *See* Complaint in Intervention at 14 (filed Jan. 4, 1982). The application of the fifteenth amendment to voting dilution cases presently stands in an uncertain state. The plurality opinion in *Bolden* states that the fifteenth amendment, like the fourteenth amendment contemplates a showing of discriminatory purpose. 446 U.S. at 61–62, 100 S.Ct. at 1496–1497 (opinion of Stewart, J.). Ultimately, the opinion goes on to state that the fifteenth amendment extends only to protecting black citizens from interference with their right to register and vote. *Id.* at 65, 100 S.Ct. at 1498. The only other Justices who considered the issue disagreed with the plurality analysis. *Id.* at 85–86, 100 S.Ct. at 1509–1510 (Stevens, J., concurring); *id.* at 102, 100 S.Ct. at 1517 (White, J., dissenting); *id.* at 125–35, 100 S.Ct. at 1531–36 (Marshall, J., dissenting). *Rogers v. Lodge* suggests that the precise scope of the fifteenth amendment remains an open question. 458 U.S. at 619 n. 6, 102 S.Ct. at 3276 n. 6. The parties have not argued that the fifteenth amendment applies

in this case to impose a standard different or more liberal than the fourteenth amendment or the Voting Rights Act. The MALDEF Intervenors did not include the fifteenth amendment claim in their statement of issues of fact and law remaining in controversy. We do not therefore consider the scope of the fifteenth amendment separately.

**20.** Lower courts, including the Court of Appeals for the Fifth Circuit, had read *Arlington Heights* and related cases as applying to voting dilution claims. *See Nevett v. Sides,* 571 F.2d 209, 217–25 (5th Cir.1978).

**21.** When enacted on August 6, 1965, the statute had read:
  No voting qualification or prerequisite to voting, or standard, practice or procedure shall be imposed by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color.
The Voting Rights Act of 1965, Title I, § 2, 79 Stat. 437.

guage minority], as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance that may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C.A. § 1973 (West Supp.1983).

The language of the Act, which derives from *White v. Regester*, 412 U.S. at 766, 93

S.Ct. at 2339, aims at codifying pre-*Bolden* case law. *See* H.R.Rep. No. 227, 97th Cong., 1st Sess. 29–30 (House Committee on the Judiciary recommending "results" amendment to section 2 of the Voting Rights Act); [22] S.Rep. No. 417 at 19–24, 27–28, 1982 U.S.Code Cong. & Ad.News at 192–202, 204–06. Congress viewed pre-*Bolden* case law as evaluating the discriminatory nature of the electoral system in question solely on the basis of objective criteria.[23] *Id.*, 1982 U.S.Code Cong. & Ad. News at 196–202, 204–06. To aid in applying section 2, Congress enumerated typical objective factors derived from *White* and *Zimmer:*

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

**22.** The House report endorsed an earlier version of the section 2 amendment, H.R.3112, 97th Cong., 1st Sess., which had incorporated a "results" test without the definitional provision in subsection (b) of the final bill, and without the caveat about proportional representation. The final language of the bill resulted from a compromise in the Senate Committee on the Judiciary. *See* S.Rep. No. 417 at 3, 1982 U.S.Code Cong. & Ad.News at 180 (history of the bill). Arguably, the House Report is, as a result, less authoritative on the meaning of the Act. From the House floor debates following Senate passage of the measure, however, it appears that the House merely viewed the compromise language as a clarification of the House's original intent. 128 Cong.Rec. H3844 (daily ed. June 23, 1981).

**23.** The development of the constitutional jurisprudence on voting dilution has not lacked for instances in which courts have arguably revised the meaning of earlier cases. In the Supreme Court, for example, the *Bolden* plurality abruptly announced that the *White v. Regester* case, which contemporary courts had viewed as a "results" case, required a showing of discriminatory intent. *See Bolden*, 446 U.S. at 68–70, 100 S.Ct. at 1500–1501 (plurality opinion of Stewart, J.). Even the author of the opinion in *White v. Regester* apparently agreed. *See Bolden*, 446 U.S. at 101–03, 100 S.Ct. at 1517–18 (White, J.,

dissenting). A panel of the Fifth Circuit undertook a similar reinterpretation of *Zimmer v. McKeithen. See Nevett v. Sides*, 571 F.2d at 220–228. In both instances, fellow jurists criticized what they perceived as an inconsistency. *See Bolden*, 446 U.S. at 103–41, 100 S.Ct. at 1518–39 (Marshall, J., dissenting); *Nevett*, 571 F.2d at 231–38 (Wisdom, J., specially concurring).

Ultimately, the reasoning in *White v. Regester* and *Zimmer v. McKeithen* will bear either reading. For present purposes, however, Congress has made clear its understanding that a court under section 2 should apply *White* and *Zimmer* as purely "results" cases. *See* S.Rep. No. 417 at 28 n. 111, 1982 U.S.Code Cong. & Ad.News at 205–06 n. 111 ("This committee does not adopt any view of *White* as requiring plaintiff to meet some 'objective design' test that is, in effect, a version of the 'foreseeable consequences' test of tort law.") (128 Cong.Rec. H3841 (daily ed. June 23, 1982) (remarks of Rep. Sensenbrenner). *See also* S.Rep. No. 417 at 19–24, 1982 U.S.Code Cong. & Ad.News at 196–202 (reviewing prior case law and Congressional understanding of *White* ). Whatever the proper interpretation of early voting dilution cases may be, Congress has set the courts to the task of giving them meaning as "results" cases. *See generally Buchanan v. City of Jackson*, 708 F.2d 1066, 1071–72 (6th Cir.1983) (no need to inquire into purpose under amended section 2).

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which the members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinders their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

S.Rep. No. 417 at 28–29, 1982 U.S.Code Cong. & Ad.News at 206–07; H.R.Rep. No. 227 at 30 (footnotes omitted); *cf. White*, 412 U.S. at 766–70, 93 S.Ct. at 2339–41; *Zimmer*, 485 F.2d at 1305. In addition, Congress cited two other factors that might have limited relevance:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, standard, practice or procedure is tenuous.

S.Rep. No. 417 at 29, 1982 U.S.Code Cong. & Ad.News at 207 (footnotes omitted); *cf. Zimmer*, 485 F.2d at 1305.[24] The factors are not an all-encompassing catalogue of the features that mark a system as discriminatory, but rather guides for discerning whether race or language unduly determine the outcome of political events. The Senate report noted:

The courts ordinarily have not used these factors, nor does the Committee intend them to be used, as a mechanical "point-counting" device. The failure of the plaintiffs to establish any particular factor is not rebuttable evidence of nondilution. Rather, the provision requires the court's overall judgment, based on the totality of circumstances and guided by those relevant factors in the particular case, of whether the voting strength of minority voters is, in the language of *Fortson* and *Burns* [*v. Richardson*, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966) ], "minimized or cancelled out."

S.Rep. No. 417 at 29 n. 118, 1982 U.S.Code Cong. & Ad.News at 207 n. 118.

Thus, when a minority group contends that an electoral system disenfranchises them because their race or ethnicity has decisive political significance, the objective factors provide indicia of how great a role race or ethnicity plays,[25] and how severe

---

**24.** Although these final two factors were entitled to weight under the *White-Zimmer* analysis, Congress explicitly accorded them less weight under Section 2. In the case of unresponsiveness, the Senate report disapproved the view that unresponsiveness was an essential element of a voting dilution claim, and stated, moreover, that a showing of responsiveness did not negate a plaintiff's claim. S.Rep. No. 417 at 29 n. 116, 1982 U.S.Code Cong. & Ad.News at 207 n. 116. This statement counters a contrary suggestion in *Lodge v. Buxton*, 639 F.2d 1358, 1375 (5th Cir.1981), *aff'd sub nom. Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982). In the case of tenuousness, the lesser weight is consistent with the change in emphasis from intent to results. The principal probative weight of a tenuous state policy is its propensity

to show pretext. *See Robinson v. Commissioners Court*, 505 F.2d 674, 680 (5th Cir.1974).

**25.** Several factors can confirm that race is at issue in the political system. Racial campaigning, for example, directly demonstrates that race is an issue. Likewise, racial bloc voting suggests that minority candidates lose precisely because of their race. *See Rogers v. Lodge*, 458 U.S. at 623, 102 S.Ct. at 3279 ("without bloc voting the minority candidates would not lose elections solely because of their race"). Even electoral defeat by minority candidates can point to racial content in political contests; such evidence raises the common sense inference that "[b]ecause it is sensible to expect that at least some blacks [or hispanics] would have been elected ... the fact that none have is important evidence of purposeful exclusion."

are the probable effects.[26] The objective factors offer a framework to distinguish an unlawful electoral system in which considerations of race or ethnicity pervade politics to the serious detriment of the minority, from a permissible electoral system in which the racial and ethnic composition of the elected body simply does not mirror that of its constituency. *See generally* S.Rep. No. 417 at 33, 1982 U.S.Code Cong. & Ad.News at 211.[27]

### B. The Constitutional Standard.

■ The constitutional standard also inquires into the extent to which race and ethnicity mobilize the electorate and combine with a voting practice to dilute the minority's voting strength. The results of a voting practice, however, only begin the analysis. As the Supreme Court has emphasized, only the most severely discriminatory results will suffice to invalidate facially neutral rules. In *Arlington Heights*, for example, the Court stated:

> Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action—whether it "bears more heavily on one race than another," *Washington v. Davis*, [426 U.S. 229, 242 [96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976)]—may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds

*Id.* at 623–24, 102 S.Ct. at 3279. Although the inference of purpose may be of secondary import under section 2, the inference of exclusion, purposeful or not, remains.

**26.** Some of the factors do not meaningfully advance the inquiry into whether race is at issue, but do signal that the effects of any racial content in politics will be exaggerated. Thus, the existence of a practice such as an anti-single shot voting provision, or a majority vote requirement does not, in itself, indicate that race has particular importance in the State or political subdivision that employs it. The practice, however, does have the potential to magnify the effects of race- or language-conscious politics. Other factors, including a history of political discrimination or the socioeconomic effects of general discrimination, presumptively explain

other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. *Yick Wo v. Hopkins*, 118 U.S. 356 [6 S.Ct. 1064, 30 L.Ed. 220] (1886); *Guinn v. United States*, 238 U.S. 347 [35 S.Ct. 926, 59 L.Ed. 1340] (1915); *Lane v. Wilson*, 307 U.S. 268 [59 S.Ct. 872, 83 L.Ed. 1281] (1939); *Gomillion v. Lightfoot*, 364 U.S. 339 [81 S.Ct. 125, 5 L.Ed.2d 110] (1960). The evidentiary inquiry is then relatively easy. But such cases are rare. Absent a pattern as stark as that in *Gomillion* or *Yick Wo*, impact alone is not determinative, and the Court must look to other evidence.

429 U.S. at 266, 97 S.Ct. at 564 (footnotes omitted).

This "other evidence" may consist of an indirect showing that the decision-makers contemplated the discriminatory result. Thus, in *Arlington Heights*, the Court suggested that a plaintiff may demonstrate intent circumstantially through evidence of: (1) the historical background of the decision; (2) the sequence of events leading up to the challenged decision; (3) procedural or substantive departures from normal decision-making; and (4) statements, including legislative or administrative history, reflecting on the purpose of the decision. *Id.* at 267–68, 97 S.Ct. at 564–65.

Clearly, some of the objective factors can perform "double duty," shedding light on both the result of a voting practice and its

reduced minority political participation. *See Kirksey v. Board of Supervisors*, 554 F.2d at 145 & n. 13 (past political discrimination); *McIntosh County NAACP v. City of Darien*, 605 F.2d 753, 759 (5th Cir.1979). Once again, reduced participation can exacerbate the effects of a racially or ethnically polarized electoral process.

**27.** The opponents of the amendments to section 2 principally contended that the Act would, de facto, require proportional representation, because the objective factors were simply too meaningless to allow courts adequately to assess when an electoral system was discriminatory, and not merely disproportionate. *See* The Voting Rights Act: Report of the Subcommittee on the Constitution of the Senate Committee on the Judiciary, 97th Cong., 1st Sess. 37–38, *reprinted in*, 1982 U.S.Code Cong. & Ad.News 278, 316–18.

purpose. *See Cross v. Baxter*, 604 F.2d 875, 880 n. 9 (5th Cir.1979) (history of voting discrimination). A tenuous state policy, for example, provides precisely the form of circumstantial showing of intent contemplated by the *Arlington Heights* evidentiary scheme. Polarized voting likewise elucidates the historical background of the voting practice or procedure; it creates a political climate that "allows those elected to ignore [minority] interests without fear of political consequences." *Rogers v. Lodge*, 458 U.S. at 623, 102 S.Ct. at 3279.

Determining whether the objective factors show either a sufficiently "stark" pattern that obviates any inquiry into purpose, or a sufficiently strong circumstantial showing of intent, requires "a blend of history and an intensely local appraisal of the design and impact" of the voting procedure "in light of the past and present reality, political and otherwise." *See id.* at 622, 102 S.Ct. at 3278 (quoting *White v. Regester*, 412 U.S. at 769–70, 93 S.Ct. at 2339–41). Occasionally, evidence of the objective factors will warrant relief. *Rogers v. Lodge*, 458 U.S. at 622–627, 102 S.Ct. at 3278–3281. Under the constitutional test, however, a court must go beyond the objective factors to assure itself that the record independently satisfies the general equal protection standard that a facially neutral rule must derive from discriminatory purpose. *Bolden*, 446 U.S. at 72–74, 100 S.Ct. at 1502–1503 (plurality opinion of Stewart, J.).

### C. *Special Problems of Single-Member Districts.*

Much of the "voting dilution" case law, and indeed most of the legislative history of section 2 of the Voting Rights Act, addresses the design and impact of at-large or multimember districts. The reasoning of the cases, and the "objective factors," do not always translate comfortably into the context of single-member districting. Nevertheless, standards for dealing with single-member districts under the "results" test are necessary in light of Congressional

intent to apply section 2's prohibition on discrimination to all voting practices. *See* S.Rep. No. 417 at 30, 1982 U.S.Code Cong. & Ad.News at 207.

The Supreme Court has seemingly treated single-member districting plans as distinct from at-large systems. For example, in *Connor v. Finch*, 431 U.S. 407, 422–25, 97 S.Ct. 1828, 1837–39, 52 L.Ed.2d 465 (1977), the Court intimated that the districting authority must purposefully draw lines to cancel out minority political strength in order to violate the constitution. The Court, however, decided *Connor* after *Arlington Heights*, and Congress may not have intended to codify *Connor* in preference to lower court authority interpreting *Regester*. Lower courts have found that *Regester* mandated a "results" test even for single-member districts. *E.g., Kirksey*, 554 F.2d at 143.

Several of the "objective factors" apply readily to single-member districts. For example, a minority that votes in single-member districts will be affected equally by any history of discrimination, and equally susceptible to the effects of depressed socioeconomic circumstances. Likewise, racial bloc voting will support the same inferences of racial politics and may bear the same prospect for ensuring perpetual electoral defeat, whether it occurs in an at-large or a single-member districting plan.

The structure of a single-member districting plan, however, does not have the same inherent tendency to submerge the minority that an at-large districting plan does. As the Eighth Circuit has noted:

Vote dilution occurs when an at-large election plan is used to cancel out the voting strength of a substantial minority population. Typically, a relatively small geographic area of a municipality will be occupied by a minority group which would constitute a majority or a near majority of a single member district if an election-by-district voting scheme was used instead of an at-large scheme.

*Perkins v. City of West Helena*, 675 F.2d 201, 203 n. 2 (8th Cir.1982). Provided that the districts are equally apportioned, sin-

gle-member districts do not obviously dilute voting strength. Only reference to the minority composition of the district and the manner in which the district lines are drawn can change such plans into devices with discriminatory results.

The minority composition of single-member districts may have the effect of cancelling out voting strength in two ways. First, district line-drawing may pack a minority into homogenous districts, thus "wasting" its potential political strength. *See Wright v. Rockefeller,* 376 U.S. 52, 57, 84 S.Ct. 603, 605, 11 L.Ed.2d 512 (1964). Alternatively, the district line-drawing might fragment minority groups among several districts, thus preventing the formation of a local majority. *See Robinson v. Commissioners Court,* 505 F.2d 674, 679 (5th Cir.1974).

While easy to state in the abstract, identifying when "packing" or "fragmenting" deprives a minority of access can present difficult problems. One difficulty stems from the uncertainty about what district configuration best serves the minority political interest. For example, in *Wright,* the Court noted that there was disagreement between the minority plaintiffs and intervenors not only about whether concentrated or dispersed districts were preferable, but also over whether the concentrated or dispersed districts were constitutionally permissible. 376 U.S. at 57–58, 84 S.Ct. at 605–606. Moreover, the feasibility of concentrated or dispersed districts may vary depending on the pattern in which minority group has settled. Whereas splitting up a cohesive minority population might, under the totality of the circumstances, cancel out minority political strength, *Kirksey,* 554 F.2d at 149–50, every movement of a cohe-

sive minority population out of a single district does not dilute voting strength. *Howard v. Adams County Board of Supervisors,* 453 F.2d 455, 458–59 (5th Cir. 1972).[28]

What will show the requisite dilution? In many cases, the ultimate conclusion has turned on purpose rather than results. *E.g., Robinson,* 505 F.2d at 679. In *Kirksey,* the lead pre-*Bolden* case in which a plaintiff prevailed without a specific finding of purpose, the requisite dilution derived from: (1) the cohesiveness of the community; (2) the fragmentation of the community; (3) deviation from expected district lines; (4) a pattern of racial bloc voting; and (5) a history of discrimination. The result was a "predictable tendency" to cancel out and minimize the minority vote. *Kirksey,* 554 F.2d at 147–51.

## V. THE OBJECTIVE FACTORS.

We next consider the evidence on the objective factors. The MALDEF Intervenors offered evidence on a history of official discrimination, the socioeconomic effects of general discrimination, polarized voting, a lack of success by hispanic candidates, and a tenuous state policy. The discussion that follows, which will constitute findings of fact, will consider each of these factors.

### A. History of Official Discrimination and the Lingering Effects of General Discrimination.

We first consider two factors together: the history of official discrimination touching on political participation and the lingering socioeconomic effects of general discrimination. In this case, MALDEF offered similar evidence with regard to both

---

**28.** *Howard* provides an illustration of the difficulties that can occur with respect to single member districts. In a reapportionment plan, the county board of supervisors split a segment of a black majority district to combine it with a white majority district. The overall effect of the plan was to leave the former black district with a smaller but still substantial majority; the former white district remained with a smaller but still substantial majority. In rejecting the dilution claim, the court noted:

> Inevitably, people of different races, national origins, and contrasting tenets will be shifted under reapportionment plans to districts in which they may no longer be in the clear majority. But when, as here, no racial motivation spawns a change in the voting area of those complaining, and the redistricting plan does not unconstitutionally dilute the voting strength of the minority, there is no abridgement of voting rights.
>
> *Id.* at 459.

of these factors, and the inferences to be drawn from the presence of these factors overlap. Both factors explain reduced political participation by the minority group.[29] Although a history of official discrimination can support an additional inference—that a facially neutral rule continues a state policy of discrimination [30]—we will consider that inference separately.

The MALDEF Intervenors have offered evidence of discrimination—both private and official—through several means. Principally, they seek to rely on this Court's judicial notice of the findings in prior cases. In addition, statistical evidence and live witnesses described the present socioeconomic status of Dallas hispanics and the reduced nature of hispanic political activity.

As the MALDEF Intervenors suggest, the State of Texas, in the past, discriminated against its hispanic citizens. In *Graves v. Barnes*, 343 F.Supp. 704 (W.D.Tex.1972), *aff'd in part sub nom. White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), for example, the court extensively considered the combined effects of the language barrier, private discrimination, and official discrimination on the hispanics' exercise of the franchise. *Id.* at 731 & n. 19. As the court stated:

> Because of long standing educational, social, legal, economic, political and other widespread and prevalent restrictions, customs, traditions, biases and prejudices, some of a so-called *de jure* and some of a *de facto* character, the Mexican-American population of Texas, which amounts to about 20%, has historically suffered from, and continues to suffer from, the results and effects of invidious discrimination and treatment in the fields of education, employment, economics, health, politics and others.

. . . .

There can be no doubt that the lack of political participation by Texas Chicanos is affected by a cultural incompatibility which has been fostered by a deficient education system.

. . . .

This cultural and language impediment, conjoined with the poll tax and the most restrictive voter registration procedures in the nation have operated to effectively deny Mexican-Americans access to the political process in Texas even longer than the Blacks were formally denied access by the white primary.

*Id.* at 728–31. In addition, the MALDEF Intervenors ask us to note that school authorities in parts of Texas have maintained dual school systems that segregated hispanic students from their anglo counterparts. *See United States v. Texas*, 342 F.Supp. 24 (E.D.Tex.1971); *Cisneros v. Corpus Christi Independent School System*, 324 F.Supp. 599 (S.D.Tex.1970).

As the MALDEF Intervenors also suggest, the Dallas County hispanic population has not achieved educational levels comparable to either the anglo or black populations. Thus, whereas only 18.7% of the black population and 9.9% of the anglo population have proceeded no further than elementary school, 46.9% of the hispanic population has not gone beyond elementary school. Although the hispanic population, on the average, has higher income levels than the black population, the hispanic average is nevertheless lower than the anglo average. VI Trial Transcript 149 (testimony of Frederick Cervantes). The evidence also showed that mean housing values in predominately hispanic areas were significantly lower than the mean housing values for anglo areas. II Trial Transcript 404–06 (testimony of Dudley Poston). On the basis of this record, we conclude that Dallas hispanics suffer serious socioeconomic disadvantage.

Several witnesses, both for the MALDEF Intervenors and the State Defendants, tes-

---

**29.** *See Perkins v. City of West Helena*, 675 F.2d at 211; *Cross v. Baxter*, 604 F.2d at 880–82 & n. 9; *Kirksey*, 554 F.2d at 143 & n. 13.

**30.** *Cross v. Baxter*, 604 F.2d at 880 n. 9; *Kirksey v. Board of Supervisors*, 554 F.2d at 143–44.

tified that discrimination against hispanics has not only occurred in the past, but continues at least in parts of Texas. *E.g.*, IV Trial Transcript 1117 (testimony of Paul Ragsdale). Still other witnesses testified about the feeling among hispanic candidates and voters in Dallas County that political action is futile. VI Trial Transcript 76, 82 (testimony of Trinidad Garza). Moreover, the evidence shows that hispanics participate infrequently in politics as measured both by voter registration and turnout. For example, 1983 P–I Exh. 37 supp. indicates that only about one-half of the hispanic voting age population in Dallas County registers to vote. Accordingly, we conclude that discrimination and its socioeconomic effects have decreased hispanic political participation.[31]

Finally, we consider the offer by the MALDEF Intervenors of the findings of the Department of Justice on electoral practices in the November, 1982 elections. According to the findings, Dallas election officials ran short of ballots, and a disproportionately large number of the precincts affected were predominately minority. 1983 P–I exh. 34. In addition, notices warning of the consequences of illegal voting were posted during the election, again largely in minority precincts. The findings allegedly bespeak continued official discrimination.

While we might accept these findings to indicate that Dallas election officials were insufficiently solicitous of minority voters, we do not attach great weight to the findings as signifying intentional political discrimination. As the report indicates, the ballot shortage resulted from inaccurate computer forecasts of voter turnout. No discussion appears in the report concerning the prevalance of, or the reasons for, the notices concerning illegal voting. Whether these incidents constituted intentional discrimination within the meaning of the *Arlington Heights* intent test is a question that could spawn an entire satellite litiga-

tion. Neither party offered testimony to explain, rebut or supplement the findings. As a result, we do not accord to the finding significant weight on the issue of official discrimination.

Although the State Defendants do not seriously contend that hispanic political participation is free from the effects of past discrimination, the State adduced evidence to show that the State has attempted to improve minority participation. We have heard testimony that voters may now register more easily in Texas than in most other states. II Trial Transcript 392 (testimony of George Pierce). Registration forms are, in addition, readily available in Spanish. Moreover, the State has attempted to improve registration by organizing voter registration drives. IV Trial Transcript 890–91 (testimony of Mark White). Despite these changes, which represent laudable attempts by the State to reverse the effects of the former political alienation of minorities, we find that the combined effect of these two factors point to discrimination-related reductions in hispanic political participation.

While the State undoubtedly has had a history of official discrimination against minorities, the evidence adduced in this case strongly suggests that official discrimination against minorities has ended, at least in Dallas County. Further, the entire process by which, following the 1980 census, the State of Texas drafted and adopted redistricting plans, culminating in the 1983 House plan, far from evidencing official discrimination, convincingly evidences full minority access to the redistricting process and a willingness on the part of almost all involved in that process to consider and effectuate minority proposals. This suggests that the 1983 House plan does not continue any past policy of official discrimination. Indeed, it represents a dramatic break with that policy. Detailed fact findings relating to the redistricting process

---

**31.** As Congress and the courts have recognized, a relationship presumptively exists between reduced political participation and discrimination-related socioeconomic disadvantage. *McIn-* *tosh County NAACP v. City of Darien,* 605 F.2d at 759; *Cross v. Baxter,* 604 F.2d at 881; *accord* S.Rep. No. 417 at 29 n. 114, 1982 U.S.Code Cong. & Ad.News at 206–07 n. 114.

are set forth in our earlier opinion in this case, *Terrazas v. Clements,* 537 F.Supp. at 528–36, and are hereby incorporated herein. Nevertheless, in spite of the recent history of official concern for minority needs and objectives, the history of discrimination against hispanics is not remote [32] and has resulted in reduced hispanic political participation at the present time.[33]

### B. Polarized or Bloc Voting.

The MALDEF Intervenors attempted to prove polarized voting in Dallas County through three techniques. First, expert witnesses offered studies of polarization in other counties. Second, witnesses familiar with politics in Dallas County related their impressions about polarization between anglos and hispanics. Finally, the MALDEF Intervenors offered detailed evidence on one electoral race—the 1982 democratic primary in the 1983 House district, district 103, with the greatest hispanic population.

At least superficially, this evidence suggested that hispanics and anglos voted in blocs: the voting studies purported to demonstrate that the voting of anglos and hispanics in other parts of Texas polarizes; most lay witnesses agreed that they saw patterns of strong support among anglos and hispanics for candidates of their respective ethnic groups; and the 1982 primary in question resulted in victory for the anglo incumbent with the hispanic candidate garnering support most strongly in predominately hispanic precincts. Close examination of the evidence, however, convinces us that such bloc voting as may exist in Dallas does not operate, as the Dallas districts are structured under the 1983 House plan, to deny hispanics an equal opportunity to participate in the political process or elect candidates of their choice.

### 1. The Evidence.

Cross-examination by the State Defendants revealed serious methodological shortcomings in the polarization studies. Notably, Dr. Brischetto, the principal MALDEF expert, made no effort in his studies to discern the effect on voting patterns of other variables—for example, party affiliation, income, campaign issues or education. III Trial Transcript 628–30 (testimony of Robert Brischetto). Moreover, Dr. Brischetto conceded that he selected for study those electoral races that pitted hispanic candidates against "formidable" anglo opposition. In addition, for his most detailed analysis, Dr. Brischetto chose only the most overwhelmingly anglo or hispanic precincts, rather than precincts with a more even population mix or with tri-ethnic populations.

Nor are these methodological choices trivial in the circumstances of this case. The testimony, for example, suggested that party affiliation has, to some extent, eclipsed the importance of bloc voting in Texas politics, V Trial Transcript 1253 (testimony of Dave Richards), and Dr. Brischetto's data revealed at least one race in which party, rather than ethnicity, apparently determined hispanic voting preference. III Trial Transcript 635–36 (testimony of Robert Brischetto). Similarly, analyzing ethnically homogeneous precincts in county-wide elections does not reliably measure the extent to which mixed anglo and hispanic populations in single-member

---

**32.** *See McIntosh County NAACP v. City of Darien,* 605 F.2d at 759; *Kirksey,* 554 F.2d at 144–45. Erasing the inference of reduced political participation in the face of evidence such as this requires an affirmative showing by the State that intervening events have made the prior discrimination too remote to carry further effects. *Id.*

**33.** Testimony suggested that low voter turnout among hispanics did not result entirely from past discrimination. Voter turnout, according to the evidence, varies with age and education.

I Trial Transcript at 204–08 (testimony of Frank Newport). The minority population in Texas has a younger age structure than the Anglo population, and, as a result, would have lower turnout even without reference to the effects of discrimination. Education, however, is affected by a history of discrimination. Accordingly, while we acknowledge that some reduction in turnout would be expected in the hispanic population in any event, we will attribute lower turnout, as distinct from registration, at least in part to the two objective factors.

districts will vote, nor does it measure the voting patterns in tri-ethnic precincts such as those in Dallas County. In addition, the practice of selecting only those elections in which "formidable" anglo opponents faced hispanic candidates results in the studies containing an unquantifiable bias in favor of electoral contests that are likely to show the most severe polarization.

These techniques not only blur the reliability of the results, but also, more specifically, study conditions that do not prevail in the Dallas House districts. The studies look at only the most extreme cases, both in terms of electoral contests and population pattern. The studies deliberately omit the analysis of combined black and hispanic areas—precisely the conditions that typify Dallas County. VI Trial Transcript 147, 154 (testimony of Frederick Cervantes).

Further, to underscore what we view as the unreliability of the studies, we also note instances in which Dr. Brischetto stated conclusions that appear to be at odds with common sense. In one instance, the 1980 Bexar County mayoral race, the prevailing hispanic candidate ran in an electorate that consisted of approximately 40% hispanic voting age population. The hispanic candidate received over 90% of the vote in hispanic districts, but also received about 35% of the vote in the most predominately anglo districts. III Trial Transcript 632–33 (testimony of Robert Brischetto). Nevertheless, Dr. Brischetto concluded that the voting was polarized. In another instance, the unsuccessful hispanic candidate for a judgeship, who was a republican, garnered only about 18% of the vote in predominately hispanic precincts. In anglo precincts, he received "precisely the reverse"—that is, overwhelming support. Dr. Brischetto concluded that the results evinced polarization. Id. at 636.

While the studies may show that hispanic candidates, depending on their party affiliation, will receive different degrees of support in hispanic and anglo precincts, it hardly demonstrates that anglo voting blocs can persistently defeat hispanic candidates in areas with a significant ethnic and racial population mixture. As Dr. Charles Cottrell, another MALDEF expert testified:

> Racially polarized voting would have various statistical degrees ... but one could still have a finding of highly polarized voting and you could still elect a minority person ... but it might very well be that the person [is] elected along the lines of receiving nine out of ten votes in the minority precincts and maybe twenty votes—twenty percent of the votes in non minority precincts .... If the phenomenon exists you have to take into consideration any kind of plan you draw for future elections.

IV Trial Transcript 813–14 (testimony of Charles Cottrell). The studies, particularly in light of their methodology, are not especially persuasive in showing that an anglo majority, particularly a small anglo majority, can or will consistently outvote an hispanic minority so as to render the ballots cast by hispanics meaningless.

The lay testimony on polarized voting likewise does not persuade us that such polarized voting as may exist operates to deny hispanics an equal opportunity to participate in the electoral process or elect candidates of their choice. Several witnesses related that anglo and hispanic voting in Dallas County polarized, or that hispanics could not easily win elections in the 1983 House district (103) that has the largest hispanic population. II Trial Transcript 459–60 (testimony of George Dillman); id. at 547 (testimony of Lee Jackson); IV Trial Transcript 852 (testimony of Trinidad Garza); id. at 1103 (testimony of Paul Ragsdale); VI Trial Transcript 50–51 (testimony of Joseph Montemayor). Uncontradicted testimony, however, showed that black and hispanic voting does *not* polarize, and that hispanic voters can, and regularly have, formed coalitions with black voters. IV Trial Transcript 832–34 (testimony of Charles Cottrell); id. at 1098–99, 1121 (testimony of Paul Ragsdale); VI Trial Transcript 54 (testimony of Joseph Montemayor). Other uncontradicted testimony showed that hispanic candidates elsewhere in Texas have succeeded in electorates with

combined black and hispanic populations no greater than those in the two 1983 house districts (103 and 107) with the largest hispanic populations. IV Trial Transcript 1125–26 (testimony of Paul Ragsdale). The general testimony on anglo-hispanic polarization takes no account of the degree of polarization, the effect of black populations or the impact of any anglo support for hispanic candidates.

Finally, we turn to the 1982 democratic primary in House district 103. In that election, anglo incumbent Steve Wolens defeated his hispanic opponent, Trinidad Garza. Garza received slightly more than 30% of the vote. VI Trial Transcript 59. Of the twenty voting precincts in the district, Garza carried only four; each precinct had a majority of combined black and hispanic registered voters. 1983 P–I Exh. 4. Garza testified that he could have done nothing else to change the outcome. VI Trial Transcript 64–65 (testimony of Trinidad Garza).

Even under the best of circumstances, we would hesitate to generalize about voting patterns or the prospects for hispanic success in district 103 on the basis of a single election. In the case of this election, Garza conceded on cross-examination that his own filing for candidacy on the deadline, poor financing, failure to obtain endorsements—including the endorsement of the Progressive Voters League, a black voter organization—and his opponent's status as a second term incumbent contributed to his defeat. Id. at 69–70. Moreover, most of Garza's campaign efforts concentrated on minority precincts, id. at 60–61, even though Garza testified that carrying all the minority precincts would not have made a difference in the election. Id. at 64. Despite his campaign strategy of concentrating on minority precincts, Garza received at least 10% of the vote in every precinct. 1983 P–I Exh. 14. In the twelve precincts with over 70% anglo population, Garza received anywhere from a low of 12.91% of the vote to a high of 44% of the vote, and in half of those precincts, Garza received more than 20% of the vote. Id. Moreover, the returns in the election underscore that voting patterns in Dallas County

are difficult to ascertain because of low voter turnout. VI Trial Transcript 147, 151–52, 154 (testimony of Frederick Cervantes). In the Garza-Wolens contest, for example, no precinct had a turnout greater than 20.9% of the registered voters. 1983 D. Exh. 2. In addition, the turnout was not particularly low in minority precincts. Of the four precincts that had less than 15% turnout, one was about 85% black, one was about 55% anglo, one was over 70% anglo, and the other was over 75% anglo. Id. We cannot conclude that the election is particularly probative of either voting patterns in the districts generally or the prospects for hispanic candidates.

To summarize, there is evidence in the record of some anglo-minority polarization in Dallas County, although not without occasional breaks in the pattern. There is also substantial evidence that blacks and hispanics regularly form political coalitions, although that, too, is not without exceptions.

### 2. The Significance of the Evidence.

Having established what we might call the "polarization profile" of Dallas County, at least as presented by this record, we now turn to its significance insofar as the Dallas districts in the 1983 House plan are concerned. According to the MALDEF Intervenors, the configurations of the Dallas districts under the 1983 House plan combine with political conditions, especially polarized voting, in Dallas to ensure that the hispanic population enjoys less opportunity than others to elect candidates of their choice. We disagree. In fact, we are of the opinion that the very opposite is the case.

The two districts that have substantial hispanic voting age population under the 1983 House plan are 103 (52.48% anglo, 18.63% black and 28.98% hispanic) and 107 (52.22% anglo, 24.15% black and 23.81% hispanic). These districts were designed by Paul Ragsdale, a long-time black representative from Dallas County, to be minority impact districts, i.e., districts in which a

substantial minority population could strongly influence, if not control, the candidate who was elected. In our view, the ethnic composition in those districts is such that no single population group—anglo, black or hispanic—can consistently outvote the other groups without forming coalitions or depending on substantial cross-over voting. This means that neither of these districts can be described as a "safe" anglo seat, and it also means that each of the three population groups has the ability strongly to influence the identity of the candidate that is ultimately elected. Our conclusions in this respect are based on our conclusions with respect to Dallas polarization, coalition and cross-over patterns, as well as on the design of the districts.

To say that the Dallas districts under the 1983 House plan violate section 2 of the Voting Right Act, we would have to say first that it was possible to design a district providing for more than hispanic impact, i.e., a "safe" hispanic district, and second that nothing short of a safe hispanic district would provide equal access to the political process for hispanics. Taking the second requirement first, for reasons that are more fully spelled out throughout this opinion and are summarized in *"The Totality of the Circumstances," infra*, we are persuaded that a safe hispanic district is not a necessary prerequisite to hispanic access to the political process. And as for the first requirement, we are of the opinion that the geographic and demographic evidence conclusively demonstrates that there is no possible district configuration in Dallas County that will eliminate the need for hispanics to form coalitions with other racial or ethnic groups if hispanics are to have an equal opportunity to participate in the political process or to elect candidates of their choice. The evidence on polarization in this record does not indicate that such coalitions are either impossible or unlikely; indeed, the opposite is the case.

The MALDEF Intervenors have offered a "best case" scenario for hispanic political hopes in the form of district 113 in the MAY–MALDEF plan. That plan can create a district that musters only a 43.66%

minority of hispanic voting age population. Particularly in light of low hispanic voting registration, this voting age population could not independently determine the outcome of elections in the district. In short, the district is an hispanic "impact" district, just as are districts 103 and 107 under the 1983 House plan, but it is an hispanic impact district created at a cost to black interests that we cannot calculate in the absence of voting age population information on adjoining districts which MALDEF failed to furnish. We cannot even ascertain whether this plan would preclear under section 5 of the Voting Rights Act. *See generally Terrazas v. Clements,* 537 F.Supp. at 536 n. 27 (paragraph (ii)). Like districts 103 and 107 under the 1983 House plan, the hispanic population in district 113 forms a substantial voting age minority that could influence the political balance of power.

To be sure, the hispanic population in district 113 of the MAY–MALDEF plan potentially has greater political influence than the hispanic populations in either district 103 of the 1983 House plan, which has a 28.98% hispanic voting age population, or district 107 of the 1983 House plan, which has a 23.81% hispanic voting age population. The present question, however, concerns whether polarized voting metamorphoses the status of the substantial hispanic voting age population minorities in districts 103 and 107 of the 1983 House plan from a potential political force into a powerless minority unable to participate in the political process. We do not think so.

Absent coalition voting with the black population, the hispanic population in district 113 of the MAY–MALDEF plan, district 103 of the 1983 House plan, and district 107 of the 1983 House plan could not independently elect their own candidate in the face of monolithic anglo bloc voting. *See* VI Trial Transcript 155 (testimony of Frederick Cervantes); VI Trial Transcript 168–69 (testimony of Paul Ragsdale). When one considers the evidence of low minority registration and voter turnout, even an hispanic-black coalition in any of

these districts would not ensure a "safe" minority seat in the face of monolithic anglo bloc voting, *see* VI Trial Transcript 165–66 (testimony of Paul Ragsdale) (probably need 70–75% hispanic district in light of hispanic voting age population and low registration); district 113 under the MAY–MALDEF plan has a 57.83% minority voting age population, district 103 of the 1983 House plan has a 47.57% minority voting age population, and district 107 of the 1983 House plan has a 47.78% voting age population.

The evidence, at any rate, does not indicate that monolithic bloc voting occurs. Even if the election of a candidate of any particular racial or ethnic group was the constitutional or statutory test, which it is not, any one of the racial or ethnic population groups in these three districts has an opportunity to elect the candidate of its choice. Both the expert testimony and the results of the 1982 democratic primary in district 103 suggest that some anglo voters will support hispanic candidates, and that black voters may, or may not, support hispanic candidates.[34] To say, on this record, that the voting strength of hispanics in any one of these districts will not influence the electoral process would require us simply to embrace the proposition that we must redesign the districting plan to guarantee proportional representation.

In conclusion, the evidence of some anglo-minority polarization does not support a finding that the political process in Dallas County is closed to hispanics as the districts are configured under the 1983 House plan.

### C. Success of Minority Candidates.

As the MALDEF Intervenors point out, hispanics have enjoyed little success in Dallas County elections. Presently, only two hispanics serve as elected officers on city councils or on school district boards of trustees. 1983 P–I Exhs. 24A, 25. No hispanic presently holds a county elected office. In the most recent elections for county offices, all four of the hispanic candidates lost. 1983 P–I Exh. 22B. Since 1962, nine hispanic candidates have run for the Texas House of Representatives in Dallas County. Six lost in primary elections and the remaining three lost in general elections. 1983 P–I Exh. 23.

The State Defendants do not dispute this evidence, and the absence of many hispanic officeholders raises the inference that the electoral system must somehow disadvantage the hispanic population. One would expect greater hispanic

**34.** As the Senate Committee on the Judiciary stated:

> The Subcommittee Report claims that the results test *assumes* "that race is the predominant determinant of political preference." The Subcommittee Report notes that in many cases racial bloc voting is not so monolithic, and that minority voters do receive substantial support from white voters.
>
> That statement is correct, but misses the point. It is true with respect to most communities, and in those communities it would be exceedingly difficult for plaintiffs to show that they were effectively excluded from fair access to the political process under the results test.
>
> Unfortunately, however, there still are some communities in our Nation where racial politics do dominate the electoral process.
>
> In the context of such racial bloc voting, and other factors, a particular election method can deny minority voters equal opportunity to participate meaningfully in elections.
> . . . .

> The results test *makes no assumptions one way or the other* about the role of racial political considerations in a particular community. If plaintiffs assert that they are denied fair access to the political process, in part, because of the racial bloc voting context within which the challenged election system works, they would have to prove it.
>
> Proponents of the "intent standard" however, do presume that such racial politics no longer affect minority voters in America. This presumption ignores a regrettable reality established by overwhelming evidence at the Senate and House hearings.
>
> These conclusions, based on a careful review of the existing track record under the "results test" in the Committee amendment have convinced us that the questions raised by some about that test are satisfactorily answered by that record.

S.Rep. No. 417 at 33–34, 1982 U.S.Code Cong. & Ad.News at 211–12 (emphasis in original) (footnotes omitted).

representation for a population group of its size. There are limits, of course, to the probative value of this inference. A lack of proportional representation has no independent constitutional or statutory significance. *White v. Regester*, 412 U.S. at 765–66, 93 S.Ct. at 2339; *Whitcomb v. Chavis*, 403 U.S. at 160, 91 S.Ct. at 1877; *Kirksey*, 554 F.2d at 142–43; 42 U.S.C.A. 1973(b). Indeed, a court-ordered remedy for voting dilution would not necessarily warrant the design of a plan that ensures proportional representation. As the Fifth Circuit has observed:

> All other things being equal, it may be assumed that if, for example, 30 percent of a school district's teaching staff is black, about 30 percent of the teaching staff at any given school should be black. Similarly, absent unlawful discrimination, if 30 percent of the available pool of labor in a plant's vicinity is black, it could be expected that 30 percent of the plaintiff's labor force would be black.
>
> Voting is a different matter. The results follow from both the pattern of districts and the voters' preferences. In employment and education, race may not be a factor in making choices. In voting, while we may deplore the use of race as a factor by voters, its use has not been forbidden. Any such ban would itself face serious constitutional problems. The necessary link between the percentage of those eligible and the percentage actually selected that exists in school cases and employment cases is missing in voting cases. Again, our conclusion is that proportional representation is not appropriate in a court-ordered plan.
>
> . . . .
>
> We have recognized that race may be considered as a factor in determining whether a proposed apportionment is acceptable. "In the process of making ... a determination [about multimember districts], a court need not be oblivious to the existence and location of minority voting strength." But we have also held that "safe" seats for the minority are not

required of a reapportionment plan in a dilution case.

*Marshall v. Edwards*, 582 F.2d 927, 936 (5th Cir.1978) (citations omitted).

### D. Tenuousness.

The MALDEF Intervenors challenged the State's policy through evidence that the drafters considered the political effects of the plan. As several witnesses conceded, the LRB avoided pairing incumbent Representatives in a single district. IV Trial Transcript 915–16 (testimony of Mark White). During 1983, when the Texas House of Representatives was considering alterations to the LRB House plan, the Texas Legislative Council analyzed alternative districts that would create a Dallas district with greater than 40% population, but ultimately limited the analysis by setting guidelines that called for no pairing of incumbents. VI Trial Transcript 134 (testimony of John Potter). Even the district lines suggest a concern for incumbents; several Representatives, including those in the minority districts, reside near the borders of their districts.

The MALDEF Intervenors urge that the protection of incumbents cannot justify dilution of a minority's voting strength. Indeed, the State Defendants do not disagree with that abstract statement of law. Instead, the State Defendants attempted to show that the protection of incumbent Representatives did not, as a matter of fact, provide the sole policy justification for not drawing an hispanic district.

In general, the State Defendants offered testimony that the LRB plan took incumbency into account only after the principal objectives of complying with the "one-man, one-vote" standard, section 5 of the Voting Rights Act and the Texas law requirement of maintaining the integrity of county lines had been accomplished. IV Trial Transcript 893–94, 913–15, 938 (testimony of Mark White). In addition, the principal drafter of the plan, Representative Paul Ragsdale, testified that he avoided concentrating as much of the minority population as possible into only a few districts in order to create "impact" districts—districts in

which a substantial minority population could strongly influence, albeit not control, the type of candidate who was elected. We credit the testimony adduced by the State Defendants.

■ The evidence does not present a pure "tenuousness" question. That is, the MALDEF Intervenors have not attacked a neutral policy offered only as a pretext for a discriminatory result. *See generally Robinson v. Commissioners Court*, 505 F.2d at 680 ("equalization of county road mileage" offered as justification for fragmenting cohesive black population). Rather, the MALDEF Intervenors have focused on only a part of the State's policy without devoting much evidence to the legitimacy of the other asserted policies. Reapportionment is a political process, and there is nothing illegitimate about considering the political consequences of a redistricting plan. *See Gaffney v. Cummings*, 412 U.S. 735, 753, 93 S.Ct. 2321, 2331, 37 L.Ed.2d 298 (1973); *Major v. Treen*, 574 F.Supp. 325, at 355 (E.D.La.,1983). Tenuousness, that is pretext, cannot be established as a factor militating against the plan simply by pointing out the obvious—that the plan has political consequences that the drafters contemplated. To show a tenuous State policy, the MALDEF Intervenors must demonstrate not only that the status of incumbent Representatives had a place in the line drawing, but also that the other asserted policies do not, in fact, support the manner in which the lines were drawn.

■ We cannot conclude that compliance with federal constitutional and statutory standards are only tenuously related to the district lines as drawn. As the earlier findings show, the previous Dallas districts were sufficiently underpopulated to require the loss of a minority district. In the face of this diminution in potential minority influence in the Dallas House delegation, the State should legitimately have been concerned with the issue of retrogression under section 5 of the Voting Rights Act. *See generally Beer v. United States*, 425 U.S. 130, 141, 96 S.Ct. 1357, 1363, 47 L.Ed.2d 629 (1976). Moreover, the State could take race into account in drawing the Dallas districts to comply with the Voting Rights Act. *United Jewish Organizations v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977).

This policy bears a direct relationship to the manner in which the districts were drawn. The plan retained three districts with substantial black majorities, and the black districts took in largely the same areas that had comprised black districts in the past. One of the districts, district 100 consists in part of an area that runs directly between the hispanic neighborhoods in west Dallas and the hispanic neighborhoods in the northern and eastern portions of the City of Dallas. We explicitly find credible the testimony of Representative Paul Ragsdale that the plan aimed not at disadvantaging hispanics but at giving the black and hispanic populations a proportionate share of the minority political influence in the Dallas districts. IV Trial Transcript 1092–93 (testimony of Paul Ragsdale).

## VI. THE TOTALITY OF THE CIRCUMSTANCES.

■ Having considered the evidence addressed to the objective factors, we turn to the issue whether the electoral scheme embodied in the 1983 House plan for Dallas County so dilutes the voting strength of hispanic voters that they have lost the ability to participate politically. In evaluating the totality of circumstances we must consider several issues: the feature of the electoral system that allegedly hinders hispanic voters in their attempt to achieve a stronger political voice; the extent to which ethnicity determines the outcome of Dallas electoral contests; the result that the Dallas districts achieve; and, for the purposes of the constitutional challenge, the intent behind the line drawing. For reasons that follow, we conclude that the districting does not, designedly or otherwise, cancel out hispanic voting strength.

### A. The Electoral Scheme.

As our findings suggest, the MALDEF Intervenors have not fairly described the 1983 districting plan. Far from "cracking"

a cohesive hispanic community, the district lines merely fail to string together dispersed pockets of hispanic population to maximize its voting strength. The plan does not place the hispanic population in districts with a politically hostile, bloc-voting majority; the two largest groups of hispanic population reside in districts (103 and 107) that in part contain substantial black population and in part contain anglo population. The ethnic composition in those districts is such that no single population group—black, hispanic or anglo—can consistently outvote the other groups without forming coalitions or depending on substantial cross-over voting.

The circumstances in Dallas stand in marked contrast to the single-member districting plan in *Kirksey.* As the *Kirksey* court summed up the matter:

Plaintiffs proved a long history of denial of access to the political process. That history of official action is one of purposeful and intentional discrimination. The structure and the residual effects of the past have been removed and replaced by current access. The supervisors' reapportionment plan, though racially neutral, will perpetuate the denial of access. By fragmenting a geographically concentrated but substantial black minority in a community where bloc voting has been a way of life the plan will cancel or minimize the voting strength of the black minority and will tend to submerge the interests of the black community.

554 F.2d at 151. Setting aside, for the moment, the influence of bloc voting and historical discrimination, we note the entirely different thesis behind the present action. The plan's drafters faced not a cohesive hispanic community but clusters of hispanic population located on either side of a predominately black House district drawn in response to a finding that blacks had been deprived of political access in Dallas. *See White v. Regester,* 412 U.S. at 766–67, 93 S.Ct. at 2339–40. Assuming that a hispanic district could even be drawn—and the MAY–MALDEF plan, which first came to the attention of this

Court and the parties after the redistricting process was complete, is the only plan even purporting to do so—the drafters would have to draw lines that would arguably fragment a cohesive black population. At the least, the drafters would have to redraw—and the MAY–MALDEF plan did—as predominately anglo the district of one black Representative.

The record does not show a dispersal of hispanics accomplished through deviations from expected lines. *See Robinson v. Commissioners Court,* 505 F.2d at 679. The district lines in the 1983 House plan are hardly a model of regularity, but they do roughly follow the lines of the plan from 1970s. In contrast, the district lines for the only majority hispanic district that this Court has seen in the course of these proceedings deviate substantially from any lines one could imagine, much less from the lines one would expect. The configuration of district 113 in the MAY–MALDEF plan graphically illustrates that the placement of the hispanic population into two districts does not result from fragmenting an hispanic community; instead, it illustrates the type of bizarre district configurations to which the drafters would have to resort in order to unite the hispanic population.

■ Without an unnatural district configuration in the 1983 House plan that "fragments" or "packs" a cohesive minority population, the issue in this case transforms. The MALDEF Intervenors seek, in essence, to compel adoption of a plan that manufactures an hispanic district by whatever means are necessary, not because the existing plan artificially thwarts creation of an hispanic district that ought to exist by virtue of the natural settlement patterns of Dallas hispanics, but rather because the hispanic population, a disadvantaged minority group, has sufficient population potentially to constitute a distinct district. We are aware of no case that has required such an exercise in political engineering. To the contrary, where the absence of proportional representation results simply from the loss of elections rather than a

"built-in bias" against a minority group, that group's voting strength has not been "cancelled out" in any constitutional sense. *Whitcomb v. Chavis,* 403 U.S. at 152–53, 91 S.Ct. at 1873–74. The same result obtains under the section 2 test unless the courts attach no meaning either to the Congressional caveat against proportional representation, 42 U.S.C.A. § 1973(b), or to the explicit codification of pre-*Bolden* law.

### B. Ethnicity in Issue.

■ Even if the district lines could fairly be described as fragmenting an hispanic community, which they do not, the evidence does not point to a political system in which the ethnicity of the candidate or the electorate determines the outcome of political events. Undoubtedly, the evidence of polarized voting shows substantial differences in the levels of support among the anglo and hispanic electorate for hispanic candidates. The evidence, however, simply does not show that the practical consequences of such polarization as does exist will be to "submerge the interests" of the hispanic community. *Kirksey,* 554 F.2d at 151.

This failure in the evidence of polarization derives from two sources. First, the evidence suggests that the anglo electorate will support hispanic candidates, albeit in lesser proportions than the hispanic population. Such cross-over voting, depending on the respective sizes of the hispanic and anglo populations, can prevent the cancelling out of the voting strength of hispanics. Second, but perhaps more important, we have heard absolutely no evidence suggesting that hispanics face dilution as a result of black and hispanic polarization. The combined black and hispanic voting age populations of the relevant districts (103 and 107) fall barely short of a majority. The evidence of black-hispanic coalition voting, combined with the evidence of some anglo support for hispanic candidates, does not support the proposition that the crucial political factor in elections for districts, such as 103 and 107, with a marginal anglo majority of voting age population will be ethnicity.

### C. The Results of the System.

From the observation that the make-up of the central Dallas minority districts (*see* Table B, *supra*) consists of a racial and ethnic mix that will not encourage race or ethnicity to decide electoral contests, the conclusion follows that those districts, even assuming that they "cracked" an hispanic population, do not deprive hispanics of access to the political process. As the evidence concerning the 1982 democratic primary in district 103 illustrates, hispanics cannot rely exclusively on their own voting strength and readily install whatever candidate they desire. While the system should offer more than "gossamer possibilities of all variables falling into place and leaning in the same direction," *Kirksey,* 554 F.2d at 150, the creation of a predominately hispanic district is not a necessary condition to access to the political process. As the Fifth Circuit has observed in the context of remedies in a racial vote dilution case:

> The goal of any remedy is to assure "effective black minority participation in democracy." But, of course, in a democracy the minority loses at the ballot box. In recognition of the inevitability of such a result, this court has concentrated upon access to the political process rather than assurance of a particular result. It is because access is a more difficult concept to measure than is result that this court has emphasized that "[t]he problem is not susceptible of simplistic solutions, however seductive they may appear."

*United States v. Board of Supervisors of Forrest City,* 571 F.2d 951, 955 (5th Cir. 1978).

Although, in the face of a stark record of past political failure of hispanics, the need for an hispanic district appears compelling, the evidence does not show that the pattern of electoral defeat and the minority composition of the Dallas districts combine to bar hispanics from the political process. In the absence of a denial of access, or discriminatory intent, the failure to consolidate the hispanic population may constitute a less

advantageous political result, but not an unlawful result. Thus, for example, in *Howard v. Adams County Board of Supervisors*, 453 F.2d 455, 459 (5th Cir.1972), the Fifth Circuit noted:

> Inevitably, people of different races, national origins, and contrasting tenets will be shifted under reapportionment plans into districts in which they may no longer be in the clear majority. But, when, as here, no racial motivation spawns a change in the voting area of those complaining, and the redistricting plan does not unconstitutionally dilute the voting strength of the minority, there is no abridgment of voting rights.

Unless the record showed intent to discriminate against hispanics, thereby raising the question of the existence of a constitutional violation, this Court must uphold the State's redistricting plan.

### D. Discriminatory Intent.

In the absence of a discriminatory result, there must be some doubt whether a showing of intent could even suffice. *See Vollin v. Kimbel*, 519 F.2d 790, 790 (4th Cir. 1975) (dilution requires "effective" intent to discriminate). Nevertheless, we will explicitly make findings on intent. The record shows that Representative Ragsdale took primary responsibility for drafting the Dallas districts that are now in force under the 1983 House plan. We have carefully considered all of Representative Ragsdale's testimony as well as the testimony of those who characterized his intent as discriminatory. Our evaluation both of his credibility and the facts upon which he relied leads us to conclude that he harbored no intent to discriminate. *See generally Terrazas v. Clements*, 537 F.Supp. at 536 n. 27 (paragraph (ii)).

Just to consider two instances, we note that Representative Ragsdale's evaluation of the difficulty, if not impossibility, of uniting the hispanic community is fully borne out by our review of alternative plans. In addition, the concept of the "impact" district, which led Representative Ragsdale not to overconcentrate minority population in just a few districts, emerges as a legitimate objective in light of the

testimony in this case. Even opposing witnesses conceded the validity of the concept. *E.g.*, II Trial Transcript 471–73 (testimony of George Dillman). Moreover, the minority community in Dallas has clearly divided over the issue whether "safe" or "impact" districts are preferable as a means of maximizing minority political power. *Id.* at 562–64 (testimony of Lee Jackson). We are unprepared to find that Representative Ragsdale intended to discriminate against those who are not in a "safe" district when the testimony indicates that his objective was to obtain the most minority political influence possible by creating "impact" districts.

### VII. CONCLUSION.

On the basis of the foregoing findings and conclusions, we hold that the 1983 House plan does not dilute the voting strength of Dallas hispanics so as to deny them access to the political process. The State has violated neither section 2 of the Voting Rights Act nor the United States Constitution. Judgment, accordingly, will be entered in favor of the State Defendants, and they are hereby ordered promptly to prepare a judgment in conformity with this opinion for entry by this Court.

This Court retains jurisdiction of this case for the disposition of related matters including the entitlement, if any, to and the amount of attorney's fees.